# CHARLESTON.

NATURAL GAS COMPANY OF WEST VIRGINIA *v.* PUBLIC SERVICE COMMISSION.

Submitted September 18, 1923.    Decided February 26, 1924.

1. PUBLIC SERVICE COMMISSION—*Burden on Public Utility to Show Reasonableness of Proposed Increase in Rates.*

   Under section 9, chapter 15-O, Barnes' Code, 1923, upon hearing of an application of a public utility company to increase its rates or charges, the burden of showing that the proposed increase is just and reasonable is cast upon the utility. (p. 567).

2. GAS—*Burden of Showing Appreciation of Leaseholds Over Investment Cost on Utility.*

Where in a rate making case, a natural gas utility company seeks to establish a rate based upon the reproduction cost-new-less-depreciation value of its property, and as a component part thereof seeks to have included therein appreciation in the value of its leaseholds over investment cost, the burden of showing such appreciation is upon the utility. (p. 567).

3. SAME—*Evidence of Appreciated Value of Leaseholds of Gas Utility Must be Independent of Rate of Earnings.*

Evidence of the appreciated value of its leaseholds, to be competent, must not be based upon, but must be independent of, the rate of return or earnings; and testimony of an expert witness to the effect that they have a certain value in the "open market" is not sufficient to establish such value; he should point out and define the character of that market, so that it can be determined that such market is not based upon the rate of return. (p. 567).

4. SAME—*Appraisal of Leaseholds Should be Made Reasonably Near Hearing.*

Owing to the shifting and changing values in natural gas leaseholds, an appraisal thereof, to be of evidentiary value, should be made reasonably near to the time it is offered in evidence. (p. 569).

5. SAME—*Appraisal of Leaseholds Made Three Years and Nine Months Prior to Hearing Entitled to Little Weight.*

So where, as in this case, it is shown that a natural gas utility company has about 61,000 acres of unoperated and about 21,000 acres of operated leaseholds and that the annual production from its operated acreage is about three billion cubic feet of natural gas, an appraisal of the leaseholds made three years and nine months prior to the hearing is entitled to little weight upon the question as to their value at the time of the hearing. (p. 569).

6. SAME—*Appreciated Value of Leaseholds Cannot be Included As Part of Rate Base of Rentals Paid by Public Exceed Such Value.*

Where in a rate proceeding a natural gas utility company seeks to include in the rate base, as a part of the present fair value of its property, appreciation in the value of its leaseholds over investment cost, an account of the delay rentals on the leaseholds, which have been paid by the public as operating expenses of the utility, should be taken and given due weight; if the rentals so paid equal or exceed the appreciation in value

of the leaseholds over investment cost, such appreciated value should not be included as part of the rate base. To so include it would permit the company to capitalize expenses paid by the public and thus inequitably require the public to pay a return thereon. (p. 569).

7. SAME—*Expenses Paid by Public in Drilling Wells Should be Considered in Rate Case.*

And likewise where the public has paid approximately two-thirds of the cost of drilling gas wells, upon an appraisal of the gas wells to establish their present fair value for rate making purposes, the expenses so paid by the public should be ascertained and due consideration given thereto. The company has no right to capitalize such expenses and to require the public to pay rates based thereon. (p. 570).

8. PUBLIC SERVICE COMMISSION—*Allowance Should be Made for Overhead Charges, But Charges Paid by Public in Operating Expenses Not Included in Rate Base.*

In determining the reproduction cost new of a utility property, generally, expenses for organization, engineering, legal services and superintendence, interest and taxes during construction, and contingencies are not reflected in estimates of the cost of labor, land and materials, and a reasonable allowance is made therefor under the designation of "overhead charges"; but such charges as have been paid by the public as operating expenses should not be included as a part of the rate base. (p. 572).

9. SAME—*Lump Sum of Percentage of Allowance for Overhead Expenses Should Not be Made on Estimate in Public Utility Rate-making Case.*

Nor in the absence of proof of the actual expenditures therefor, should a lump sum or percentage allowance be made upon mere estimate, without a proper analysis of the different items included in the estimate, and without evidence tending to show that the expenditures so estimated were reasonably necessary to the construction of the plant. (p. 572).

Petition by the Natural Gas Company of West Virginia against the Public Service Commission and others for suspension of an order of the Commission.

*Reversed and remanded.*

*M. G. Sperry* and *George R. C. Wiles,* for petitioner.
*M. J. Cullinan, Carl O. Schmidt* and *A. W. Laas,* for respondents.

MEREDITH, PRESIDENT:

The Natural Gas Company of West Virginia appeals from an order entered by the Public Service Commission March 10, 1923, refusing an increase in its natural gas rates.

The company has in effect a rate of 40c per thousand cubic feet, subject to a discount of 2c per thousand if paid on or before the 12th of the month following that in which the gas is supplied, with a minimum charge of 90c per month. On July 20, 1922, it filed its petition asking for authority to put into effect a "step-up" rate as follows:

> First 5000 cubic feet per month at 45c;
> Second 5000 cubic feet per month at 50c;
> Third 5000 cubic feet per month at 55c;
> All over 15000 cubic feet per month at 60c;

all the foregoing rates to be subject to a penalty of 2c per thousand if not paid on or before the 12th of the month following that in which the gas is supplied.

Upon final hearing, the commission refused to allow any increase and dismissed the petition. Chairman Divine filed a written opinion giving an analysis of the case, wherein he finds that the actual investment of the company as of September 15, 1922, was $1,377,121.03; makes an allowance for working capital of $187,000, and the sum of these two items, $1,564,121.03, he finds to be the present fair value for rate making purposes. Taking this as the rate base, he finds that the present rates afford the company a fair return, an amount sufficient to give it a return of 8% upon its investment, and in addition thereto to provide a fund to cover depreciation and depletion of its property. Commissioners Rider and Lewis dissented from the principles applied by the Chairman in reaching his conclusions; disagreed with his finding that $1,564,121.03 was the fair value of the company's property for rate making purposes or a proper rate base, but without attempting to fix a proper rate base, agreed that the present rates produced sufficient revenues to pay expenses and to provide a reasonable amount for depreciation and depletion and a fair return upon the fair value of its property devoted to public use. They in no wise analyzed

the facts and as to how or why they reached their conclusions we are not informed. In the recent case of *City of Charleston* v. *Public Service Commission,* 95 W. Va. 91, 120 S. E. 398, we referred to the fact that the commission in its findings should analyze the elements making up the rate base in rate cases. It is unfair to the public and to the utility not to do so; and it is unfair to the commission as well as to the court that may be called upon to review its findings. When the record is made up, if there be anything lacking, if the commission needs further light upon any question of fact, it has the authority and means to find it, and a proper analysis will determine whether there is such need; this court must take the record as it is presented here. It can not make an independent investigation to discover new facts or to clear up points in controversy. Besides, the members of the commission, by reason of their experience, become experts, so that they have a great advantage over this court in determining all questions of fact; and a fact, once found by the commission, will not be disturbed by this court, if there is sufficient evidence to support it, *Baltimore & Ohio R. R. Co.* v. *Public Service Commission,* 90 W. Va. 1, 110 S. E. 475; *Norfolk & Western R. R. Co.* v. *Public Service Commission,* 82 W. Va. 408, 96 S. E. 62; *City of Charleston* v. *Public Service Commission,* 86 W. Va. 536, 103 S. E. 673.

But the company contends that the commission failed to ascertain the facts; it found no rate base; it did not determine the present fair value of the company's property for rate making purposes. The only ultimate fact the commission found was that the present rates afford a sufficient return upon the present fair value of the company's property. What that fair value is, the commission failed to state. The rate base upon which the present rates are calculated nowhere appears in this record; so it becomes necessary for us to review the evidence in order to determine whether the ultimate finding of the commission is correct, because the utility can not be compelled to furnish gas to the public at less than a fair return, based upon the present fair value of its property used and useful in the public service.

While the amount prudently invested by a public utility

has been a number of times considered by this court as the proper rate base, notably in *Coal & Coke Ry. Co.* v. *Conley,* 67 W. Va. 129, 67 S. E. 613, and *Bluefield Waterworks & Improvement Co.* v. *Public Service Commission,* 89 W. Va. 736, 110 S. E. 205, and in every case this is a proper element to be considered, it is not always controlling. The fair value of its property may exceed the investment cost. In such case, the Supreme Court of the United States holds that the present fair value of the property devoted to the public service must control, and that the return must be based on that rather than investment cost. For that reason, the Bluefield Waterworks case was reversed. 258 U. S. 622, 66 U. S. Sup. Ct. Rep. (Law. Ed.) 796; 42 Sup. Ct. Reporter, 315.

## Properties of the Company

The company has two fields of operation, the Ohio Northern District, and the Southern District. There is no physical connection between the two, and this inquiry concerns only the Southern District, except as certain items are apportioned between them. The Southern District embraces its operations in southwestern Pennsylvania, northern West Virginia in the vicinity of Wheeling, and certain territory in Ohio opposite Wheeling. Except as otherwise noted, all the figures presented in this opinion refer to the Southern District. On December 31, 1921, it owned 83,261 acres of gas leaseholds, of which 21,535 acres were developed, and 61,708 acres undeveloped, but held in reserve. All of its present producing territory is in Green and Washington Counties, Pennsylvania, and Belmont County, Ohio; some of its undeveloped territory lies in Marshall County, West Virginia, but at the present time the company neither produces nor purchases any gas in this state. All its supply is produced in the other two states. It owns 185 producing gas wells; has a system of gathering lines, field lines and mains, with compressor stations having a capacity of 2000 horsepower, and its distributing lines. It supplies gas to 15,976 domestic and industrial consumers, of which 14,890 are in West Virginia, 568 in Pennsylvania and 518 in Ohio. Of those in this state, 12,963 are in Wheeling, 881 in Benwood, and 1046 are in rural communities near Wheeling. Of its 62 industrial con-

sumers, 48 are in Wheeling, 9 in Pennsylvania, and 5 in Ohio. During 1920, the company produced ˙3,636,891,000 cubic feet, and purchased 41,180,000 cubic feet of gas; in 1921, it produced 2,724,184,000, and purchased 156,106,000; during the first five months of 1922 it produced 1,660,410,000, and purchased 79,087,000; for the first eight months of 1922, it produced, purchased and sold 2,159,696,000 cubic feet; from September 1, 1922, to the date of the order, the company's purchases, production and sales are not disclosed by the record.

## History of the Company.

As the historical cost of the company is to be considered, it is important to examine the company's history. It is one of the oldest gas companies, if not the oldest, in this state. It was organized in 1885, and began business in Wheeling in 1886. It confined its operations to the Southern District until 1905; its main business is that of producing and selling natural gas to the public, though it also produces oil and manufactures gasoline. Its manufacture of gasoline is inconsiderable, half of its net profits from this source are credited to the gas department, so there is no controversy on that score. On March 9, 1886, the capital stock of the company was increased to $500,000; on April 9, 1886, 4991 shares were exchanged for $100,000 cash and 5244 acres of oil and gas leaseholds located in the three states. In November, 1886, the capital stock was increased to $1,000,000, and the additional 5000 shares were sold for $500,000 cash; thus the total issue was exchanged for $600,000 cash and 5244 acres of leaseholds, the latter for $400,000 of the stock at par. No inquiry was made in this proceeding as to the actual value of these leaseholds. We do not think it unfair to assume that they were worth much less than $400,000 cash. What became of these leaseholds, whether they have been drilled and exhausted, are still retained or were surrendered, does not appear.

The following taken by statistician Nease from the Company's books shows the outstanding stock for the various years, and the dividends paid either in cash or stock:

| Date | Stock outstanding | Cash dividends | Rate % | Stock dividends |
|---|---|---|---|---|
| Mar. 31, 1886..$ | 235,480 | | | |
| Mar. 31, 1887.. | 310,000 | | | |
| Mar. 31, 1888.. | 1,000,000 | $ 80,000 | 8 | |
| Apr. 30, 1889.. | 1,000,000 | 35,000 | 3½ | |
| Apr. 30, 1890.. | 1,000,000 | 60,000 | 6 | |
| Apr. 30, 1891.. | 1,000,000 | 45,000 | 4½ | |
| Apr. 30, 1892.. | 1,000,000 | 60,000 | 6 | |
| Apr. 30, 1893.. | 1,000,000 | 45,000 | 4½ | |
| Apr. 30, 1894.. | 1,000,000 | 40,000 | 4 | |
| Apr. 30, 1895.. | 1,000,000 | 10,000 | 1 | |
| Apr. 30, 1896.. | 1,000,000 | | | |
| Apr. 30, 1897.. | 1,000,000 | | | |
| Apr. 30, 1898.. | 1,000,000 | | | |
| Apr. 30, 1899.. | 1,000,000 | 30,000 | 3 | |
| Apr. 30, 1900.. | 1,000,000 | 100,000 | 10 | |
| Apr. 30, 1901.. | 1,000,000 | 100,000 | 10 | |
| Apr. 30, 1902.. | 1,000,000 | 100,000 | 10 | |
| Apr. 30, 1903.. | 1,000,000 | 120,000 | 12 | |
| Apr. 30, 1904.. | 1,000,000 | 180,000 | 18 | |
| Apr. 30, 1905.. | 1,000,000 | 140,000 | 14 | |
| Apr. 30, 1906.. | 1,000,000 | 140,000 | 14 | |
| Apr. 30, 1907.. | 1,000,000 | 100,000 | 10 | |
| Apr. 30, 1908.. | 1,000,000 | 140,000 | 14 | |
| Apr. 30, 1909.. | 1,000,000 | 140,000 | 14 | |
| Apr. 30, 1910.. | 1,000,000 | 150,000 | 15 | |
| Apr. 30, 1911.. | 1,000,000 | 180,000 | 18 | |
| Apr. 30, 1912.. | 1,618,709 | 267,087 | 16½ | $750,000 |
| Apr. 30, 1913.. | 1,756,200 | 263,430 | 15 | |
| Apr. 30, 1914.. | 1,756,200 | 280,992 | 16 | |
| Apr. 30, 1915.. | 1,756,200 | 210,744 | 12 | |
| Apr. 30, 1916.. | 1,756,200 | 228,306 | 13 | |
| Dec. 31, 1916 (8 mo.) ..... | 1,999,933 | 119,996 | 6 | 186,500 |
| Dec. 31, 1917.. | 2,000,000 | 300,000 | 15 | |
| Dec. 31, 1918.. | 2,000,000 | 320,000 | 16 | |
| Dec. 31, 1919.. | 2,000,000 | 300,000 | 15 | |
| Dec. 31, 1920.. | 2,000,000 | 360,000 | 18 | |
| Dec. 31, 1921.. | 2,997,200 | 299,720 | 10 | 997,200 |
| June 30, 1922 (6 mo.) ...... | 2,997,200 | 239,776 | 8 | |
| | | $5,185,051 | | $1,933,700 |

If we assume that the total cash capital paid in was $1,000,-000, the total cash dividends paid have been more than five times the amount paid in. If but $600,000 represents the capital paid in cash, then the total cash dividends paid thereon amount to more than eight and a half times the amount paid in. The stock dividends declared amount to $1,933,700; almost twice the paid in capital if $1,000,000 be correct, and more than three times the paid in capital, if $600,000 be the correct sum. If the declaration of stock dividends was warranted, it can be properly assumed that they were out of actual earnings. But wholly eliminating the stock dividends, the cash dividends in 37 years amount to 518½%, based on a paid in capital of $1,000,000, or 864½%, based on a paid in capital of $600,000. The percentages shown above in the tabulation are calculated on the total outstanding stock, including that issued as stock dividends as well as the stock actually paid for in cash. If the dividend stock be excluded, the percentages will run nearly three times higher for the last seven years. It will be recalled that the company is also engaged in the oil business; how much of these dividends arose from that source is not disclosed, though it might be roughly calculated from the company's exhibit No. 23, where it is shown that up to and including 1921 the following was the net income from all the company's properties:

Net income:

| | | |
|---|---:|---:|
| Southern group of gas properties | $4,635,763.24 | 63,98% |
| Ohio North gas properties | 979,376.34 | 13.52% |
| Oil properties | 1,418,512.94 | 19.57% |
| Gasoline property | 134,867.07 | 1.86% |
| Miscellaneous | 77,717.31 | 1.07% |
| | 7,246,236.90 | 100% |

It will be observed that the net income from the gas development in the southern district is about 65% of the total; hence the dividends derived and paid from that source would approximate $3,370,000. While the past income of the company is not a controlling factor in this case, it is a relevant factor that must be considered.

*Present Fair Value for Rate Making Purposes*

We now come to the main question, and that is, what is the present fair value of the company's property for rate-making purposes?

The protestants contended before the commission that the amount of the company's investment, less the amount earned and set aside for depreciation, as disclosed by its books, which have always been carefully kept, should represent the fair value. On the other hand, the company sought to find the fair value by showing reproduction cost new, less depreciation, and contended there and insists here that the fair value as shown by an appraisal made by its witness, Mr. Samuel S. Wyer, an expert business engineer, should be taken as a ·rate base. As might be expected, there is a wide difference between the results obtained under the two methods. Chairman Divine adopted the view of the protestants; the majority of the commission rejected this view, in theory at least, but failed to state what method they deemed controlling; however, they found the ultimate fact against the company, that is that the company was not entitled to any increase.

Mr. Wyer appraised the company's property in the Southern District as of January 1, 1919, making his report March 25, 1920, as follows:

| | |
|---|---:|
| 1—Natural Gas Land | |
| Reserve Natural Gas Leases..$445,505 | |
| Operated Natural Gas Leases.. 614,230 | $1,059,735 |
| 2—Natural Gas Wells.................. | 675,600 |
| 3—Transmission Lines.................. | 934,618 |
| 4—Compressing Stations................ | 134,775 |
| 5—Field. Headquarters................. | 54,500 |
| 6—Distributing Equipment............. | 629,555 |
| 7—Executive Headquarters............. | 4,000 |
| | 3,492,783 |
| 8—Overhead Charges— | |
| For promotion, organization, legal, engineering, interest, taxes during construction, superintendence and contingencies—18% of sum of items 2 to 7 inclusive.  .18x$2,433,048=  .......... | 437,948 |

| | |
|---|---:|
| 9—Reproduction Price................. | 3,930,731 |
| 10—Depreciation Deduction— | |
| Taken at 20% of sum of items 2 to 8 | |
| inclusive.  .20x$2,870,996 = ........ | 574,188 |
| | |
| 11—Plant value....................... | 3,356,532 |
| 12—Going value—10% . of plant value— | |
| .10x$3,356,532 = .................·..... | 335,653 |
| | |
| 13—Present fair value of property...... | 3,692,185 |

He gave his testimony August 8, and September 25, 1922. Since the appraisal, the evidence shows there were additions made to the property amounting to $800,261; to this he adds $137,000 for working capital, thus bringing his total up to $4,629,346. Let us take up his report as summarized above.

1. He appraised the gas leaseholds as follows:

Unoperated acreage:

| | | | | | |
|---|---|---|---|---|---:|
| Greene County, Pa. | 6,549 a. at | $20 | ...... | $130,990 |
| Washington Co., Pa. | 8,045 a. at | 10 | ...... | 80,450 |
| Marshall Co., W. Va. | 3,625 a. at | 20 | ...... | 72,500 |
| Belmont Co., Ohio | 32,313 a. at | 5 | ...... | 161,565 |

$445,505

Operated Acreage:

| | | | | |
|---|---|---|---|---:|
| Greene County, Pa. | 8,645 a. at | $50 | ...... | $432,250 |
| Washington Co., Pa. | 3,369 a. at | 25 | ...... | 84,225 |
| Belmont Co., Ohio | 6,517 a. at | 15 | ...... | 97,755 |

$614,230

Total appraised leasehold value........$1,059,735

The witness states that these prices per acre fixed by him he regarded as fair, "on the basis of considering such leaseholds for sale in the open market." He does not define or point out any "open market" for them, nor state whether the purchaser in this "open market" was one engaged in selling gas to the public or one buying it from a public utility company. He further says they are worth that value to this company because they have been gathered together in one ownership, even though they have actually cost nothing; that he did not consider their cost, nor the fact that for years

the consumers have been paying the rentals to keep the leases alive.

There are two objections to his testimony that we deem material. The first is that, while he may have been qualified as an expert witness, he does not sufficiently define the open market for these leaseholds. The burden in this case is upon the company to establish its right to an increase. Section 9, ch. 15-0, Barnes' Code, 1923. The mere statement of the witness that the leaseholds are worth so much in the open market is not enough; he should have pointed out that market, defined it and explained its character. Of course, if a natural gas public utility were the proposed purchaser, evidence of its offer would not be competent to show fair value in a rate case; and in like manner evidence of one whose valuation is based upon what he could obtain for the property when offered to a public utility would be incompetent; or if it is based upon the rate of return at the time of the offer or upon anticipated returns from the public, it should be rejected. Generally speaking, evidence of value in a rate-making case can not be based upon the rate of return or earnings of the utility; and whenever this appears, either directly or indirectly, such evidence is incompetent. It is almost inconceivable that there could be an open market for these gas leaseholds, situated as they are, which would not be based upon the rate at which the utilities there are selling gas to the public. While we held in *City of Charleston* v. *Public Service Commission,* 95 W. Va. 91, 120 S. E. 398, that in a rate case a utility is entitled to include in its present fair value, as a rate base, appreciation in the value of its leaseholds over investment cost, yet the evidence thereof must not be based upon, but must be independent of, the rates of return or earnings. Since the burden of showing the necessity or fairness of the proposed increase in rates is upon the company, a like burden is imposed upon it to show the value of its leaseholds over investment cost, as their value forms a component part of the rate base upon which the return is calculated. We hold, therefore, that a mere statement that they have a certain value in the open market is not sufficient; the party desiring to establish such value must

by proper testimony show that it is independent of the rate of return or earnings of the company. Guided by this rule, the evidence in this respect is insufficient.

But it is insufficient, if not irrelevant, for another reason. The valuation was made as of January 1, 1919; the witness testified to it in August and September, 1922, nearly three years and nine months thereafter. The record shows that the company produced during this period from its leaseholds about three billions of cubic feet of gas annually, thus reducing its reserves by that much. While the witness does say that because of the increasing scarcity of gas, what remains is worth as much as or more than the quantity on hand when the appraisal was made, yet this is a mere speculation; but notwithstanding this statement, and the company's reliance upon it, it asks and insists that it is entitled to have a depreciation allowance of 8% annually, not only upon its physical property, such as compressor stations, pipe lines and the like, but also upon the valuation placed upon its leaseholds. If the leaseholds increase in value as the gas is exhausted, to be logical the company should not ask for any depreciation allowance thereon. There are so many elements of uncertainty and speculation that enter into opinions regarding the value of gas leaseholds, and their value is so constantly shifting and changing that, as we said in *City of Charleston* v. *Public Service Commission, supra,* no appreciation in their value over investment cost should be allowed in rate making cases, unless the circumstances be exceptional. We do not think such exceptional circumstances have been shown here. The books of the company show that the investment cost of the leaseholds is 414,854.31; of this, 400,000 appears to have been paid in stock of the company for the original 5244 acres, so that in 37 years the company's additional investment in leaseholds has been very slight. Sprinkle, a witness for the company, testifies that the average cost of acquiring leaseholds has been about ten cents per acre.

Now during the whole life of the utility the rentals to keep these leases alive have been paid by the public; since the commission has been regulating public utilities, these rentals have been charged to operating expenses. In all such in-

quiries, it would be well for the commission to ascertain the amount of rentals so paid, and the amount thereof should be considered and given due weight. If the delay rentals would equal or exceed the excess of present values over investment cost of the leaseholds, then there should be no allowance made for the increase in values. Not to do so would in effect permit the company to capitalize the rentals paid by the public as operating expenses, and require the public to pay a return on them. From the testimony it appears that they now run from one dollar to one dollar and fifty cents per acre annually; it does not appear from the record, but it is quite possible that the rentals already paid far exceed the total valuation placed on these leaseholds by Mr. Wyer. This is a circumstance that can not be ignored. For the foregoing reasons, we think that Mr. Wyer's valuation should be rejected; the investment cost of the leaseholds should be regarded as the basis for fair value, subject to depreciation charge as will be discussed hereafter.

2. Mr. Wyer appraises the second item, "Natural Gas Wells" at $675,600. His report shows the date each well was drilled and its depth; a few of them were drilled twenty-five or more years ago; others twenty years; others fifteen; and others varying from ten years to one year; from the various depths he deduces the average depth of all the wells; the 100 wells in Pennsylvania are found to have an average depth of 2589 feet; the 56 in Ohio, an average depth of 1384 feet. He estimates the value at about two dollars per foot of depth, and thus arrives at the following:

100 wells in Pennsylvania, average depth
  2589 ft. at $5300 each.................  $530,000
56 wells in Ohio, average depth 1384 feet,
  at $2600 each........................   145,600

                                          $675,600

He says that the above valuations include only the following items, which are shown under section 12, page 10 of his report:

(a)  Labor, teaming and freight; this includes the labor of setting the packer, and properly tubing the well.
(b)  Rig.
(c)  Drilling.
(d)  Gas and water.
(e)  Supplies.
(f)  Use of casing.
(g)  Casing and tubing.
(h)  Packer.
(i)  Fittings.
(j)  Well shooting (5% of wells shot).
(k)  Road building.

He totally ignores the fact that practically two-thirds of the cost of all the foregoing items have already been paid by the public as operating expenses. All the items for labor, teaming, freight, drilling, well shooting, road building and placing the casing and tubing, have been so paid. The materials, such as rig, casing and other machinery, have been carried to investment account, and the public has been paying for their use; so that we do not find a single item in this list, for which the public has not already paid, or does not pay for its use annually in the rates charged. But he takes the position that this makes no difference; for example, if the company drills a gas well at a cost of $5300 and this drilling cost is immediately paid by the public in rates, he treats it as though the company paid it, because the well belongs to the company, and he says it is worth that amount; that that is its value to the cmopany. For example, he uses the oft-repeated illustration "If the property had been willed to them it would have made no difference; it is their property, and my function was to secure the present fair value of that property as of the date used in the appraisal." Of course, this is an evasion of the question. If the $5300 well had been willed to the company, it would not have cost the public anything, and the company would be entitled to include that value in its estimate of the fair value of its property. But we can not ignore the fact that most of the enumerated items have been paid by the public; they were not willed to or given to the company; their payment was not a voluntary but an

involuntary, an enforced, payment, a payment which the public could not avoid. Theory in such cases must give way to fact. Equity and fair dealing require that at least two-thirds of the valuations placed on these natural gas wells by the witness be totally disregarded in ascertaining the fair value of the company's property on the reproduction theory; to regard all of it would require the public to keep paying a return and a depreciation charge on $450,400 of it, which it has already paid.

3. Items 3 to 7 inclusive, listed under their respective heads, may be treated together. For example, beginning on page 44 of his report, under the heading of "Transmission lines" he lists the number of feet of pipe line, size, kind of pipe, whether plain or screw, condition whether new or second hand, the years laid, and fixes his values upon the average unit prices of such materials for the ten years preceding September, 1915. His estimate does not reflect to any appreciable extent the general advance in prices since that time; to that extent, and it probably would be a considerable item, he says later about 52%, his listed valuations are probably less than the company is entitled to. The sum of these five items is $1,757,448. The length, sizes and quantities of pipe and other materials were taken from the company's books. Of course, in such case his appraisal could not be made from personal inspection. There is included in these items the average cost f. o. b. mill, freight, labor of unloading, hauling, construction or installation, and rights of way where required; in other words, all costs. The total, or $1,757,448, is his estimated reproduction cost new at the average price unit prevailing for the ten years preceding September, 1915. If subjected to a proper depreciation charge, this item may be correct. To this we will refer later.

4. Under the head of "Over-head Charges", item 8, Mr. Wyer places a valuation of $437,948, or 18% of $2,433,048, the aggregate of items 2 to 7, inclusive. This estimate covers:

(a)  Promotion or organization costs.
(b)  Interest during construction.
(c)  Taxes during construction.
(d)  Engineering and legal expense.
(e)  Superintendence and contingencies.

He does not attempt to separate these costs; he makes no explanation; his testimony is not based upon the company's experience, although its books have been well kept and the greater portion of these costs, if any, could have been shown. It is well known that other costs enter into the construction of a plant, in addition to the bare costs of labor, land and materials, which are not reflected in the estimate of labor, land and materials alone.. Before the land and materials are purchased and the labor is employed, an organization must be perfected, lawyers and engineers employed, and considerable preliminary work done. All this means expense. If the construction is let to contract, a reasonable amount for the contractor's profits must be allowed; money must be furnished as the work progresses, so that during the period of construction, and before the plant, or the portion of it under construction, begins to earn money, an allowance for interest on the money so furnished is usually made; and so with taxes and insurance during construction. Estimates of the cost of a plant, such as the one under consideration, rarely approach accuracy; many matters can not be foreseen, hence they are not provided for; to cover these contingencies an allowance is made therefor under that head. All these several items are designated by engineers as ''Overhead charges'' and an allowance therefor made in their estimates upon a percentage basis. Generally, there can be no valid objection to a reasonable allowance for such charges, but no hard and fast rule has been or can be worked out to govern all cases. The allowance in each case must be fixed in accord with its own peculiar facts and circumstances. In many instances such charges have been disallowed altogether, and in others, where an allowance is made, the percentages vary with the facts proved, and they are seldom the same in any two cases. It must be remembered that the inquiry here relates to the reproduction cost new of, not an ideal plant, but the particular plant involved in this case and in the present location. amid the same surroundings, and subject to whatever local conditions that might reasonably be expected to affect costs. A witness testifying in relation to such reproduction costs should therefore show that he is familiar with such local conditions, as well as with the particu-

lar property in question. We are of opinion that in any estimate of the present fair value of the company's property, based upon reproduction cost new, less depreciation, there may properly be included in such estimate a reasonable allowance for "overhead charges", if such charges have not already been paid as operating expenses, but the evidence as to the amount is too uncertain in this case for us to determine any particular sum. Upon further inquiry the commision can ascertain such amount as may be warranted by the evidence, and that sum, when so found, may be given such weight, along with the other facts relevant to the inquiry, as the commission may deem proper. But no allowance for overhead costs should be made where they have already been paid by the public as operating expenses. The utility should not be permitted to capitalize such overhead charges and require the public to keep on paying a return on expenses already repaid the utility. If, however, it should be found that actual expenditures have heretofore been made for overhead costs which have not been charged to and paid as operating expense, allowance should be made therefor.

5.  Under item 10, he deducts for depreciation 20% of items 2 to 8 inclusive, or $574,199. He does not depreciate the natural gas leaseholds because, as he says, they increase in value as natural gas becomes scarcer. This might within limits be true, but true only to a limited extent. If this were true to the extent he implies, then there should be no depreciation allowance upon values of leaseholds; and yet he testifies that the allowance for depreciation, on all the company's property, including leaseholds, should be from 6% to 8%. If it be fair to allow a rate which will provide for depreciation, we can not see how it would be unfair to take that depreciation into account, when received or earned, in determining a new rate base. Of course, if the appraised valuation of the leaseholds as fixed by Mr. Wyer was shown by competent evidence to be their present fair value, that necessarily would be a valuation found, after deduction of all accrued depreciation; but as we have found that his appraised valuation is not shown by competent evidence, we need not consider further the question of depreciation of that appraised value.

The protestants seriously, and we think not without justi-
fication, object to the fact that Mr. Wyer's appraisal allows
only 20% for depreciation. Under his estimate, this affects
only the machinery, pipe-lines, casing, rigs, and the like. Of
course, a great part of these were installed or laid many years
ago. In speaking of the average time the materials have been
used, he says the "weighted average" is about 20 years, and
depreciates his reproduction cost 1% per year. His estimate
of the average period of use is a mere estimate, nothing more.
But that pipes laid in the ground or expensive machinery
installed and in use will depreciate only 1% yearly we can
not believe. He gives little affirmative evidence on that score;
his figures seem to have been fixed arbitrarily and without
regard to well known facts. How long would a gas com-
pressor station last when in use? Or casing in a well? Cer-
tainly not a hundred years, and we believe that they would
depreciate more than 20% in twenty years. And so with
pipe lines, boilers, engines, rigs and other machinery used
by a gas company. He could make no personal examination
of most of these items, so his appraisal could not be based
upon first hand knowledge, as respects a considerable part of
the property. In deed we do not find it stated anywhere that
he personally inspected any of these items. His depreciation
seems to be based upon what he terms "service value" not
market value. For example, he says "The depreciation put
in here represents the difference in value, as a public utility
and as a piece of property in a plant, that would be 100 per
cent new,—a piece of pipe, so far as service value is con-
cerned, even though in the last years of its life, so far as
service function is concerned, will have as much value as a
piece of new pipe." We can not approve this theory of
service value in finding a rate base. There are sufficient com-
plications without injecting into this inquiry this new and
elusive speculative element. The reproduction value, less de-
preciation, means the value of the property in terms of
money; the rate base is determined as being a certain value in
money and the rate of return fixed as a certain percentage
of that base. We are of opinion that Mr. Wyer's percentage
of depreciation is too low. No evidence was introduced by
protestants on that phase. They were content to rest their

case on the fact that the depreciation reserve set up on the company's books was $2,280,225.04; and contending that this is an admission against interest, a record made yearly by the company, it is bound by it. We do not think it is irrevocably bound by this book-keeping entry; while the books may show the depreciation as estimated yearly by the officers of the company, they do not necessarily show the depreciation actually accrued. However, in determining the accrued depreciation, we can not say that the depreciation reserve account shown by its books should not have more evidentiary value than the mere theoretical estimate of any expert, who, from the situation of the property, could not and did not testify from first-hand knowledge, acquired by personal inspection. Consequently, we are not impressed with Mr. Wyer's estimate of a depreciation of only 20%. We are asked by the company to exercise our independent judgment upon the evidence and determine the rate base. This we would do if we had sufficient facts before us. We are not disposed at any time to shirk our duty; but to determine the value upon the basis of reproduction new, less depreciation, we must know how much that depreciation is. As already stated, we think one per cent annually is entirely too low; it is distinctly disproved by the conduct of the company in setting upon its books a much higher percentage throughout its entire history; by asking and being permitted to charge a rate which the commission estimated would produce 8% annually; and by Mr. Wyer himself, who says the company ought to be allowed 6% to 8% for depreciation.

If we reconstruct Mr. Wyer's figures, we have the following:

| | | |
|---|---|---:|
| 1. | Gas leaseholds (investment cost) | $414,854.31 |
| 2. | 1-3 of $675,600 (Wyer's valuation of natural gas wells) | 225,200.00 |
| 3. | Transmission lines | 934,618.00 |
| 4. | Compression stations | 134,775.00 |
| 5. | Field headquarters | 54,500.00 |
| 6. | Distributing equipment | 629,555.00 |
| 7. | Executive headquarters | 4,000.00 |

Total as of Jan. 1, 1919 ..........$2,597,502.31

Add 52% of items 2 to 7, Wyer's estimate of August, 1922, prices over prewar prices ........................ 1,134,976.96
Additions made since January 1, 1919     800,261.00

                                              $4,522,739.27
Deduct depreciation as shown by books   2,280,225.04

                                              $2,242,514.23
Add 10% for going value ........        224,251.42

                                              $2,466,765.65
Add for working capital (Wyer's figures) ...........................        137,000.00

Reconstructed rate base ............ $2,603,765.65

It will be observed that we have not made any allowance for overhead charges, because we do not think the evidence justifies it. Now let us see what the company's present rate base in fact is, assuming that it is allowed an annual income of 16%, 8% for return and 8% for depreciation. Its average annual net income, after paying all operating costs, for the years 1917 to 1921 inclusive, was as Chairman Divine finds, $404,515.43; this is 16% of $2,528,208.93. Hence the actual rate base for those years was $2,528,208.93, assuming that 16% was a fair return. That that return is sufficient is conceded. From the record we can not say that the operating results for 1922 were not as good as the average for the five preceding years, the record being incomplete for that year. It does show, however, that for the first six months of 1922 the company paid a cash dividend of 8% on $2,-997,200 of capital stock. Nor does the record affirmatively show that this prosperous condition under present rates will not continue for a reasonable period in the future. The difference between the actual rate base upon which the company has been operating and the reproduction new less depreciation rate base, as reconstructed above, is about $75,000 in favor of the latter; but this is a difference found upon estimates only. Of course, the addition of overhead value would make a still greater difference. So while Chairman Divine ascertains the rate base to be but $1,564,121.03, the actual

earnings at present rates produce a net income of 26% on that base instead of 16%. It is quite apparent on this data that we could not reverse the order of the commission; we can not find from it as a matter of fact that the company's property is being confiscated by a too low rate. It is not our duty to fix rates; that is not a judicial function. It is the business of the commission to do that, and for the court to determine judicially whether the rate is so low as to confiscate the utility's property, or so high as to confiscate the customer's property.

But as the commission is not bound by any one method in ascertaining the fair value of a utility's property, neither is this court. It is the privilege as well as the duty of both to consider all available methods, all relevant facts, so as to arrive at a correct solution; to find what is fair to all. It is the duty of the commission as well as of this court to protect the utility as well as the public. We repudiate the suggestion of counsel for protestants that it is the duty of the commission to protect only the public, unless the utility be considered also as an integral part of the public; the commission acts in the interest of both; they stand before it on equal terms. The expenses of both parties in these cases are ultimately borne by the public. Both have ample facilities afforded them to arrive at what is fair. If the company receives an 8% return for dividend purposes on its investment, and a sufficient additional return to keep its investment intact, this ought to be sufficient. We have in examining this record tried to look at it from the utility's stand-point; to see whether there was not some basis upon which it might fairly be accorded a higher return. For example, counsel for the company in their brief say:

"Petitioner's exhibit No. 29, compiled from the figures shown on pages 18 and 19 of Nease's report, shows that Petitioner's average yearly investment in its Southern Gas Property for the thirty-five years covered by this report, is $2,173,134.49, and that its average yearly income after paying operating expenses and before making any allowance for depreciation or depletion was $196,-763.49, or the equivalent to a return of 9% per annum upon its average actual net investment, without making

any allowance for going concern value or cash working capital. This exhibit further shows that a return of 8% upon petitioner's average yearly investment would have required a net income of $173,850.76, leaving as applicable to depreciation and depletion reserve an average of $22,912.75 each year, or a total of $801,945.55 for the thirty-five years, which is $1,478,279.49 less than the reserve set up on the company's books."

This statement would be true if the premise were true; but in stating that the average yearly investment for the thirty-five years is $2,173,134.49 no account is taken of the constant depreciation. That is the average, before the depreciation is deducted; if that be deducted, the average yearly investment is only $1,474,132.31. The yearly net income has been $196,763.49, or 13.35%, this after paying all expenses. The total net operating income from 1887 to 1921 inclusive was $6,886,722.21. The total return at 8% during this period was $4,126,808.10. Deducting this from the total net operating income leaves $2,759,914.11 for depreciation and amortization. The company, out of the latter sum, set up on its books, for depreciation, $2,280,225.04, leaving $479,-689.07. Out of this remainder, in 1920 and 1921, it set up on its books for an amortization fund the sum of $315,355.69, as shown by its exhibit No. 25. Whatever deduction may be drawn from these figures, whether there was an actual depreciation of its property during this period, amounting to $2,280,225.04 or not, the fact remains that the company collected from its consumers $2,759,914.11 for depreciation and amortization. It actually received that much money over and above an 8% return on its investment. A great part of this as it was collected from time to time was reinvested in its plant to keep it efficient, in other words, part of it was used for replacement of capital, and so far as it was used for replacement purposes it did not increase the amount of investment over what it was before; but whatever was used for additions and extensions to the plant increased the investment by that much. Hence the amount of the investment varied from year to year. Mr. Nease started with the year 1887, when the invested capital as shown by the books was $1,121,-673.42, each year adding thereto the amount used for ad-

ditions or extensions, and at the end of the year deducted the amount earned for that year for depreciation. This gave the amount of investment at the end of that year. This was carried on from year to year, when he found the investment at the end of 1921 was $1,358,940.48, the figures used by Chairman Divine. No depreciation was deducted unless it was actually earned; so that we can not say that these are mere theoretical figures. We observe that during some of the earlier years, no depreciation was earned. The total amount for depreciation has been only 5.35% instead of 8%, as has been contemplated by the commission. However, it appears that during the years 1917 to 1921 the company has been earning 8% for return and 8% for depreciation on a valuation of more than $2,500,000, or about 26% on a rate base of over $1,564,121.03, as found by Chairman Divine. Now under these circumstances we can not say the rates allowed do not provide a fair return upon the fair value of the company's property, whether we take as a rate base the invested capital or the reproduction cost new less depreciation, as we have found it from the readjusted figures. We are, however, of opinion that the reproduction new value, less depreciation, would be properly increased by a proper charge for overhead costs; and in order to allow the company opportunity to present proper proof of this item, as well as any other pertinent matter, since it has been almost a year since the order was entered and many changes have doubtless taken place in that time, we think it proper to reverse the order and send it back for further investigation and inquiry. The commision will give such weight to the reproducton new value less depreciation, as it considers it entitled to, being guided at all times by the principle that the company is entitled to a fair return upon the fair value of its property devoted to the public service.

*Reversed and remanded.*