## STAMFORD GAS AND ELECTRIC COMPANY
*vs.*
## TOWN AND CITY OF STAMFORD

Superior Court　　　Fairfield County　　File # 38765, 41719

MEMORANDUM FILED AUGUST 30, 1938.

Cressy, Bartram, Melvin & Sherwood, of Stamford, for the Plaintiff.

Thomas J. Ryle, of Stamford; Maurice J. Buckley, of Stamford; Samuel Gordon, of Stamford, for the Defendants.

CORNELL, J. The named plaintiff in each of these causes, was at the time these actions were instituted, the owner of gas and electric manufacturing and distributing plants employed for the purposes of furnishing heat, light and power

in the town and city of Stamford. Its properties have since been acquired by The Connecticut Power Company, which corporation has been substituted as the party plaintiff, pursuant to motion granted by this court. The physical plant consists of a large tract of land on the easterly side of Stamford harbor on which are located a number of buildings housing machinery and equipment and, also, unenclosed mechanical and kindred structures and equipment, extensive gas and electric distribution systems and a large office building and the land whereon it is located designed and used exclusively for plaintiff's own purposes. On the 1931 list, these properties were assessed at a total of $5,676,980 and increased by the board of relief to $6,664,980; the 1932 list at $4,752,380 and increased by the board of relief to $6,624,160.

The causes consist of appeals taken pursuant to the provisions of sections 1194 and 1195 of the General Statutes, Revision of 1930, by the original plaintiff from the doings of the board of relief of the town and city of Stamford in so increasing the assessments of such properties in each of said years. The matter was referred to the late Hon. John K. Beach as a state referee for a finding of facts and report to this court. The questions now presented are precipitated by remonstrances filed by each of the parties to the acceptance of the referee's "Second Amended Finding and Report" as further amended by the addition of certain facts to which counsel for each of the parties have stipulated. The report consists of 116 paragraphs, many of which are deleted, added to or supplemented by agreement of counsel, to the extent that some 55 additional paragraphs are thus submitted. The plaintiff's brief consists of some 117 pages and defendants' of 48, each containing elaborate arguments in support of the propositions for which it contends.

It is manifestly impossible and unnecessary to discuss all of these grounds of remonstrance singly, or to notice each of the arguments submitted in support of, or in attack upon, them. In the main, they fall with reference to the several propositions of law involved, into the following categories, viz.: (a) those which have to do with the applicable rule of assessment, viz., plaintiff's remonstrance, paragraph 1; those which relate to the unit of assessment, viz., defendants' remonstrance, paragraph 3, of part C; those which are concerned with the means of establishing value for purposes of taxation

with particular reference to evidence of theoretical character, viz., plaintiff's remonstrance paragraphs 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 17 and defendants' remonstrance, paragraph 3 of part C; such as question the inclusion or exclusion of certain elements in the use of the depreciated reproduction theory for estimating value for purposes of taxation, viz., plaintiff's remonstrance, paragraphs 14, 15, 16, 18 and 19 and defendants' remonstrance, paragraphs 1 and 2 of part C; those which involve the question of discrimination, viz., plaintiff's remonstrance, paragraphs 20 and 21 and as intimately connected with this, certain requests for correction of the referee's findings, viz., defendants' remonstrance paragraphs 1 of part A and 2 of part B and the applicability of same to certain items on plaintiff's list, viz., defendants' remonstrance paragraphs 2 of part B and 6 and 7 of part C; those which contend that the Report does not contain any conclusion of assessable values, viz., plaintiff's remonstrance, paragraph 2, and finally, the scope of treatment and the extent of relief which the court may apply to the facts as found by the referee, or the Report as it may be corrected, in the light of the allegations contained in the appeals, viz., defendants' remonstrance paragraph 5 of part C. The objections to the acceptance of the Report made by each of the parties will be considered as thus grouped together.

The appeals allege, in substance, that the plaintiff duly filed its verified list of all of its taxable property in October, 1931 and October in 1932, respectively, and in each instance listed its property in general classifications placing no valuation on any of it; that the assessing officials in each of these years valued plaintiff's list as already stated; that thereafter with respect to each of such assessments, the board of relief gave notice to it to appear and show cause why its assessment should not be increased, following which, the increases as above noted were made. This resulted, it is asserted, in plaintiff's property being excessively and disproportionately assessed on each of the lists in question.

The referee, subject to certain possible additions or deductions not material at this juncture finds that the value of plaintiff's taxable property on the list of 1931 was $5,616,021 and on the list of 1932, $5,039,206 and that on the list of 1931, it was disproportionately assessed. Of the constituent elements which comprise these totals, the items of land values and material and supplies, as the assessment of these were

made by the board of relief, were not disputed before the referee. Neither are the values of the buildings, automobiles or fences and docks as found in the Report, questioned. So that the controversy as it now exists and as it has been treated by the parties is almost entirely concerned with the value for purposes of assessment of the machinery which composes plaintiff's gas and electric producing plants, and the equipment which constitutes its distribution systems, as well as machine tools and office furniture and equipment, insofar as these affect the total of plaintiff's lists. As concerns the latter the conclusions reached by the referee were predicated upon values derived from markets which he found to have existed at or near the respective dates of assessment as second-hand goods of their respective species; those concerning the other items insofar as the Report is questioned are predicated upon estimates of reproduction value less depreciation.

## UNIT OF ASSESSMENT

*Cost of installing machinery.*

The Report discloses that plaintiff's gas manufacturing and electricity producing plants are both located on its harbor bordered land. Portions of the machinery comprising each of these are in the buildings located thereon; other mechanical structures forming elements in each stand unhoused but affixed to the premises.

The referee has based his conclusions concerning the taxable value of all of the machinery under such designations as "gas plant and holders", "electric plant, etc.", "coal hoists, etc.", on estimates of reproduction costs, as depreciated to the respective dates of assessment. In so doing he included estimated depreciated costs of installing such machinery to an extent which it is agreed total $698,000 on the list of 1931 and $795,000 on the list of 1932, computed at full value. (See stipulation, paragraph 107.)

The plaintiff claims that it is to be assessed for such machinery and mechanical items on the basis of a theoretical dismantling of the plant, i.e., as for so many boilers, so many turbines, so many compressors, etc., etc., and that hence there is no occasion for including installation costs as an element of value. The defendants maintain that the assessment is to be based on the value of the plant as an assembled and integrated unit, and so installation costs are a factor in such value

and must be included. Both adopt the premise that the machinery is to be assessed apart from the realty. They differ only in the manner of theoretical detachment, plaintiff's conception comprehending not merely a severance of each individual unit from land and buildings, but also from all connection with the other units in combination with which it constitutes a plant—while defendants' would theoretically lift it all, *en masse,* from the realty but in so doing keep the interrelation of each unit with the other, intact, and thus preserve its theoretical identity as a plant.

It was observed in *Sprague vs. Lisbon,* 30 Conn. 18, in construing a portion of Comp. 1854, title LV, chap. 1, §8, p. 339, that there was then no express provision for the assessment of machinery, as such, in a mill for the purpose of taxation.. The court while insisting that it was taxable was sore put to find a statutory classification in which to place it. After adopting the definition of a "mill" as that term was employed in the statute, as "a complicated engine or machine for grinding or for performing other operations by means of wheels and a circular motion", it was held that the machinery used in connection with it was comprehended within that term and assessable accordingly. The same absence of any specific statutory direction as to how machinery, as such, is to be assessed has continued since the decision in *Sprague vs. Lisbon, supra,* in 1861 and obtains today. From this, the inference seems plain—since it must be assumed that the legislature became aware of the opinion in the case mentioned, in the interim—that the General Assembly has not to date entertained any notion of taxing machinery in any manner different from other tangible personal property when it is personal property nor apart from realty when it is permanently. attached to a building and used in connection with it. In the one case a machine or other article of equipment when unattached to, even though stored within but not used in connection with a building is, of course, a chattel and like any other like article, taxable in accordance with the provisions of section 1147 of the General Statutes, Revision of 1930, which provides for the assessment of "goods, chattels or effects, or any interest therein." Where, as here, machinery is attached directly to the land or installed in and used in connection with a building and machinery, and building and land are all owned by the same person, the machinery is assessable with the land in the one case and with the building in the other as a "building used for manu-

facturing purposes" in accordance with the provisions of section 1143 of the General Statutes, Revision of 1930—but in either case under such circumstances, as realty. This is made manifest it is believed by the policy revealed in the history of statutory law in this state, relating to local taxation, concerning the instant subject-matter.

In 1796 ("An Act for the Direction of Listers in Their Office and Duty," Statutes of Connecticut, 1796, pp. 274-282), land was assessed according to its availability for certain uses and its location at a fixed sum per acre; dwelling houses according to the number of fireplaces at $2.50 each, contained in them (p. 279). There was then no provision for the taxation of buildings of any other type or as devoted to any particular purpose. Corn mills, slitting mills, oil mills, and saw mills were the only mills assessed (p. 280).

The revision of 1808 ("An Act for the Direction of Listers in Their Office and Duty," Statutes of Connecticut, 1808, title CII, chap. 1, pp. 462-474) continued the assessment of dwellings at an arbitrary figure for each fireplace with which they were equipped (§13) but instanced the beginning of a policy of taxing such buildings and all others for other uses to which they were put or for which they were adapted. It provided (§15): "Each store or ware-house, whether part of or connected with any part of a dwelling-house, or not," should be set in the list at a fixed amount according to its height measured by the number of stories it had, up to three. Mills were assessed substantially as provided in the 1796 compilation. While there was a provision for the taxation of mechanics, "according to their profits", the structures in which the activities of such persons might be carried on were given no special mention.

The revision of 1821 ("An Act for the Assessment of Taxes," Statutes of Connecticut, 1821, title 100, chap. 1, pp. 444-450), which incidentally evidences a departure from the assessment of property for taxation at specified values and the adoption of a percentage of their "worth in money" as a basis for assessment, is the parent of the present section 1143 of the General Statutes, Revision of 1930. It differs from it only in arrangement and in details of no materiality here. This required (§2), in effect, that dwelling houses with their lots not exceeding two acres should be assessed, "with due regard to the situation, use and income" thereof; that other land be set in the list and assessed by acre according to its

worth in money, "with reference to the advantages of soil, situation and income" and that "mills, stores, distilleries and buildings, with their improvements, used for manufactories of all kinds, shall be valued with respect to situation, and present income; and set in the list, at three per cent of such value." That machinery was comprehended in the phrase "buildings, with their improvements used for manufactories of all kinds" as employed in this portion of the statute seems conclusive when considered in connection with the provisions of section 5 of the act in question. This, *inter alia*, exempts from taxation for a period the "building, machinery and land" not exceeding five acres, used in the manufacture of woolen and cotton cloths, "belonging to each establishment." The last mentioned assumes the fact that "machinery" as well as buildings and land used for the purpose of manufacturing was assessable under the other terms of the statute—otherwise there would be no reason to exempt it. In the absence of other specific provision for the taxation of machinery belonging to a manufacturing establishment, it strongly suggests that it was to be taxed as part of a building used as a manufactory or such a building with its "improvements."

The tendency to tax real property according to its adapted or adaptable special uses, however, was not confined to those instances mentioned in the provisions of the statutes quoted or referred to supra. Fisheries were included, "whether appendages of any farm or lot, or block, or wharf" (§2). It is evident, too, in the requirement that "quarries, mines and ore-beds, whether owned in fee or leased, shall be set in the list separately....," now, also, a part of §1143, *supra*. It is unnecessary to refer to the various alterations and amendments concerning statutes relating to taxation from 1821 to 1854 as pertinent to the question presently discussed.

The provisions of section 7 of Statutes of Connecticut, Comp. 1854, p. 839 forms the subject-matter of section 1143 of the Revision of 1930. This makes provision for the assessment of land, dwelling-houses, mills, stores, distilleries, buildings used for manufacturing purposes, fisheries, quarries, mines and ore-beds. Insofar as is material to the present inquiry the latter differs from the former only in that it omits mention of buildings used as distilleries and in providing for assessment at full value instead of at 3% thereof as in the 1854 revision. In consequence, the legislative intention as concerns the assessment of "buildings used for manufacturing

purposes" must be taken to have been the same for all practical purposes in 1854 as it was when the assessment of plaintiff's property was changed by the board of relief in 1932 and 1933, respectively. Section 11 of chap. 1 of title LV of the Compilation of 1854, *supra,* contained this prohibitory provision, "....and no....corporation or company shall be assessed at a less sum than the present, true and just value of the real estate and machinery attached or belonging thereto, unless reduced by indebtedness existing that may be deducted as in other cases hereinafter specified." This section no longer exists, but as it stood in the revision in question must, of course, be read in connection with the other parts of the statute of which it was one, and, particularly so, with the provisions of section 7 thereof relating to the assessment of "buildings used for manufacturing purposes." This done it constitutes, in itself, a then contemporaneous interpretation by the General Assembly, itself, of its own expressions in respect of the taxation of "buildings used for manufacturing purposes" and makes it apparent that machinery was to be assessed with the buildings devoted to such use, i.e., as real estate as "attached or belonging thereto." If that was true in 1854, it is so at present under statutory directions that are substantially, so far as is material, identical. Without doubt, it was principally these considerations which the court had in mind when, as dicta, referring to the assessment of machinery in a mill, it observed in *Sprague vs. Lisbon, supra,* p. 21: "It would perhaps have been more strictly proper had the assessors treated it as a mere appendage or appurtenance of the building, and thus assessed the whole establishment under the general designation of 'mill' or 'manufacturing establishment'."

This sketchy outline of the history of the legislation with which concern is had here is indicative (1) of the legislative intention to assess real property according to the use to which it is adapted as specified in the several classifications named in section 1143 *supra;* and (2) that the machinery permanently affixed to land is to be assessed with such land, if devoted to manufacturing uses and with the buildings where it is incorporated therein, in cases where the building is employed for manufacturing purposes and so, in either case, as realty.

*Machinery constituting plant elements attached to land is to be assessed therewith; machinery affixed to buildings in like manner.*

It results from this that as the machinery attached directly

to the land and that incorporated in the buildings constitute together, plaintiff's gas and electric manufacturing plants, all of such machinery is to be assessed with the land or buildings as the case may be and the whole as constituting a manufacturing establishment. Since this contemplates the permanent union of such machinery in an assembled and integrated state, it necessarily conceives that the cost of installing it is included in the value of the completed plant. Such installation costs are, hence, a proper element to be included in a theoretical estimate of the value of such land and buildings, respectively, and are so in the instant case.

*Inclusion of installment costs of machinery involves no taxation of intangible property.*

The plaintiff's objection that the assessment of the machinery as an assembled unit would involve taxation of intangible elements and so not conform to section 366c of the Cumulative Supplement to the General Statutes (1935), which limits the assessments of property of utility companies for purposes of local taxation to that which is "real and tangible personal property" is not in point for the following reasons, viz.: (1) because as noted *supra,* the machinery is not to be taxed as dismantled or unattached items of personal property; (2) the only question presented here is concerned with whether the cost of installing such machinery on the land and buildings to which it is affixed is an element of value to be given effect in determining the assessable valuation of land, buildings and machinery, together as composing a manufacturing establishment; (3) because, in any event, it confounds intangible personal property with intangible elements of value in tangible property (*See Wilcox vs. Madison,* 103 Conn. 149) and (4) no increment of value has been found by the referee or included in his Report arising from the combination of such land, buildings and machinery into an assembled manufactory.

As concerns the third and fourth reasons mentioned, it may be conceived without difficulty that the value of the land may be enhanced or lessened by the buildings and other structures upon it; that of buildings by the location of the land, because of its location or surroundings on which they stand and the purposes to which they are devoted; that of a plant such as plaintiff's by both the location of the land and the character of the buildings in which it is housed or in connec-

tion with which it is designed to function. The operative interplay of any or all of these considerations exerted by one or more upon another or others would affect, of course, the value of the land with the machinery attached thereto or the buildings with the machinery in them and so might in the one case result in increasing and in the other decreasing the value of either or both, land and buildings, beyond what they would otherwise be. In the instant case, however, the method described by the Report, consists in valuing the land, buildings and machinery as separate items, distinct from each other and the final valuation of all three is the sum total of the valuations of each of them, only. There is no intimation and certainly no allocation of any specific item indicative that the value of either element was effected in any way or in any degree by an increment arising from their combination to constitute a manufacturing plant. Neither party has remonstrated for this reason. The valuations arrived at as based upon estimates of cost of reproduction less depreciation are devoid of any non-taxable intangible elements of that species.

No reference has been made to the provisions of the Cumulative Supplement to the General Statutes herein, as this did not become effective until April 30, 1933. It is not believed, however, that it makes any change in respects applicable to the situation here.

For the reasons noted, paragraphs 18 and 19 of plaintiff's remonstrance are overruled.

*Office furniture and equipment, machine tools, assessable as personal property.*

As already noticed, the Report finds the value of the items of office furniture and equipment and machine tools as based upon the existence of a market for second-hand goods of their several species. Defendants claim, in effect, that since on their theory the unit of valuation for assessment is an assembled plant and not the items of machinery, etc., which constitute it, all property composing or used in connection with the plant must be included in any estimate of such value. From this premise they project the contention that where estimates of value of theoretical character are resorted to from which to determine the valuation of the various elements of machinery, buildings, etc., which together make up such plant, the same method must be adhered to with respect to all other items.

As noted in the foregoing discussion, however, the assessment is not of a plant as such, but of real and personal property. Defendants' premise is hence, non-existent. Pursuing this thesis, the value of the machinery, equipment, apparatus—not the value of the thing constituted by these elements in assembled combination—is of importance in a determination of the value of the land and buildings to which it is affixed and is assessable with these. But articles not attached to either of them are "goods, chattels or effects" and are to be assessed as personal property. It is found: "machine tools can be used for many purposes other than repairing gas and electric equipment and they do not form a necessary part of the appellant's gas and electric plant" (stipulation, paragraph 94). Obviously, this is true, also, of office furniture and fixtures. It results that such items are personal property, the value of which may be ascertained from any competent evidence. Among the latter, palpably is that of fair market value.

Paragraph 3 of part C of defendants' remonstrance is overruled.

### "FAIR MARKET VALUE"

*Market for second-hand property, as office furniture and fixtures; machine tools.*

In paragraph 4 of part C of its remonstrance, defendants object to the acceptance of the Report because, as it is claimed, the referee's finding of the market values of office furniture and fixtures and machine tools is predicated on "possible" sales to second-hand dealers. Defendants apparently overlook the fact that the referee has specifically found (paragraph 91): "There was a market for second-hand furniture and office equipment in 1931 and 1932." The values arrived at were based upon that market which is the only kind of a market which it could reasonably be expected there could be for used furniture and equipment of the kind. With respect to machine tools the paragraph substituted in the stipulation in place of paragraph 94 of the Report contains the same statement of ultimate facts as does the latter, viz.: There was a second-hand market in which this machinery and equipment could have been sold in 1931 and 1932. This must be taken to mean that there was an existent market for second-hand tools in which one was able to sell such used property. Conclusions of value, predicated on such findings are not open

to objection such as is made here. Paragraph 4 of part C of defendants' remonstrance is overruled.

## RULE OF VALUATION

It is provided in section 1143 of the General Statutes, Revision of 1930, that real estate, inclusive of "buildings used for manufacturing purposes....shall be set in the list at their present true and actual valuation"; and in section 1147, that personal property shall be assessed at its "then actual valuation." Section 1149, which is captioned "Rule of Valuation", reads as follows: "The present true and actual value of any estate shall be deemed by all assessors and boards of relief to be the fair market value thereof, and not its value at a forced or auction sale." Section 1143 (then section 1183 of the General Statutes, Revision of 1918) and section 1149 (then section 1197 of the General Statutes, Revision of 1918) were examined in *Underwood Typewriter Co. vs. Hartford,* 99 Conn. 329, where it was held that a finding of "fair market value" of a factory building within the meaning of section 1149 could not be predicated on estimates of theoretical reproduction value. It was further ruled, in effect, that "fair market value" can only be ascertained from evidence of sales in a market of the particular species of property to be assessed and that when no such evidence is available, section 1149 does not apply. Under such circumstances, the opinion states, it is necessary to ascertain the assessable values from other competent evidence to satisfy the requirements of section 1143, thus to establish "the present true and actual value." *See, also Somers vs. Meriden,* 119 Conn. 5, 7.

In the endeavor to establish the assessment values of the several items of properties on both the 1931 and 1932 lists, in the present case, neither party submitted any evidence of market value of the items comprising some of the classifications of property. In such instances the evidence is confined wholly to estimates of the cost of reproducing same, less depreciation. In the cases of some others, the plaintiff submitted evidence which it claimed established sales values, while the defendants, as to these, too, confined themselves to evidence of reproduction cost less depreciation. Among these latter are the items of machine tools, office furniture and equipment, electric transformers and meters, electric manufacturing machinery and equipment, gas compressors and electric wire. The Report finds the assessable value of the first two of these

items at figures conforming to their value in second-hand markets for property of their respective kinds, but in the instances of the other items mentioned, determined these at amounts equivalent to their value on a depreciated reproduction basis. In paragraph 1 of its remonstrance the plaintiff attacks all of the valuations found by the referee assigning as a reason therefor that they do not represent "the fair market value of plaintiff's property, which is the ultimate fact to be found under the statute", but apparently intends to limit the contention to the valuations attributed only to those items which are determined on theoretical estimates of value and to the total of the lists as affected thereby.

*Application of section 366c of the Cumulative Supplement to the General Statutes (1935).*

The claim is predicated on the provisions of section 366c of the Cumulative Supplement to the General Statutes (1935), enacted in 1931, which insofar as material here, reads as follows: "Real and tangible personal property owned by any company, as 'company' is defined in section 1087, employed in the manufacture, transmission or distribution of gas or electricity or both to be used for light, heat or motive power or in the operation of a system of water works for selling or distributing water or both for domestic or power purposes or for two or more of such purposes, shall be set in the list of each town where such property is situated on its assessment day and shall be liable to taxation at its fair market value...." This, plaintiff argues, establishes a rule of assessment applying to the properties of public utilities of the descriptions named in it, exclusively, and so renders the provisions of section 1143 requiring real property to be assessed at its "present true and actual value" and section 1147 which specifies that personal property shall be assessed at its "then actual valuation", inapplicable to the assessment of its property. It next maintains that since, according to the opinion in the *Underwood* case, *supra,* "fair market value" cannot be established from estimates of theoretical character, the Referee's findings of assessable value based upon reproduction cost less depreciation do not fulfill the legal requirements and must be rejected. Only values emanating from a market regardless of what kind of a market it may be, it contends, will satisfy the mandate of the statute, stating it thus: "If any particular item of tangible property, real or personal, lacks ready salability that

is a factor affecting its market value which ought to be recognized. If certain items of property are salable second-hand, let us recognize their value as such. If some items can't be sold except for junk, let us face that fact, too, and assess them, accordingly. As pointed out in *State vs. Weiher, supra,* 'it is only by thus sticking to the statute that we can achieve any sort of responsible guide to uniform and proper assessment'."

Plaintiff's claims, it would seem, predicate upon a misconception of the purpose and intent of the statute in question. These must be learned by considering the act in the light of the state of the law when it was adopted. It must, therefore, be read in conjunction with sections 1158 and 1159 of the General Statutes, Revision of 1930, to which it is kin. These relate to the manner in which and the place where property consisting of water power owned by individuals and corporations shall be assessed. The two sections mentioned appeared as sections 2344 and 2345 of the General Statutes, Revision of 1918, and as such were interpreted in *Hazard Powder Co. vs. Enfield,* 80 Conn. 486, 489, as follows: "The general purpose of §§2344 and 2345 is to provide the manner in which, *and the place where,* owners of water-power, under the different circumstances which may exist as to its creation and use, shall be assessed for it. Section 2345 applies to cases where the power is created and reserved in one town, and applied and used in another. Section 2344 applies to cases where the power is both created and used in the same town."

A brief reference to the condition of the law at the time section 366c was enacted makes its dominant purpose manifest. The case of *Conn. Light & Power Co. vs. Oxford,* 101 Conn. 383, was decided in 1924. The issues presented in it required a construction of what was then section 1219 of the General Statutes, Revision of 1918 (now section 1159, *supra*). It was there held, in substance, that the land under a dam, a portion of which was located in each of two towns should be assessed in each as respects the part located there, but that the power, the dam and the property comprising the electric transmission system were all "incidental" to the machinery operated by the power and were hence to be taxed in the town where such machinery was situated, regardless of whether the dam and transmission system were in another town or towns.

*Section 366c applies only to place of assessment and manner of assessment as affected thereby.*

The effect of section 366c is to change the holding in *Conn. Light & Power Co. vs. Oxford, supra,* in that it provides that whether the property of a "company" to which it applies, be real or tangible personal property, it is thereafter to be assessed in "each town where such property is situated." It alters the place of assessment of transmission systems and other property as that was fixed in what is now section 1159 as construed in the *Conn. Light & Power Co.* case and in so doing identifies its purpose and limits its scope, as concerned only with the *place of assessment* and the manner of it solely as the latter be affected by the changes made as respects the situs of the same for purposes of assessment.

The conclusion is that section 366c, *supra,* has as its intention the effectuation of two purposes, viz.: (1) to provide that the assessment of properties owned by the class of corporations to which it applies be made in each town, of the portion thereof there located, and (2) to include within the operative effect of its provisions in that respect, properties of utilities furnishing light, heat and power whether the same be hydraulically or mechanically generated.

The circumstance that the statute in question includes a phrase to the effect that the property within its purview shall be liable to taxation at its "fair market value" is, in itself impotent to divest the act of its dominant purpose or to convert it into one of different intendment as, e.g., one prescribing a standard or rule of assessment applicable to the subject-matter with which it deals.

The expression, "fair market value" as used in it like those of "actual value", "true and actual value", "present true and actual value"; and the like are frequently employed in statutes as synonomous, or, at least, with evident disregard of the sometimes subtle distinctions attributed to them empiricistically. The same inclination is evident in judicial expression. *Wilcox vs. Madison,* 103 Conn. 149, 152 ("fair actual market value") where the complaint was that the plaintiff's property was assessed in excess of one-half of its "fair market value" and the court treats "actual value" as meaning the same thing. *Greenwoods Company vs. New Hartford,* 65 Conn. 461, 466 (actual value).

If, however, the phrase be given its literal significance it is synonomous with "present true and actual value" as plain-

tiff demonstrates in its brief, and so, the latter conjunction of words may be substituted for "fair market value" as these appear in the statute, without changing the effect of the act, and its intendment is then the same as sections 1143 and 1147. This, of course, does not align with the majority opinion in the *Underwood* case, which I must decline to follow either in its reasoning or in its conclusion, that there are, in effect, two different standards of value for purposes of assessment, viz.: (1) "fair market value" as prescribed in section 1149 which must be established by evidence of sales in a market· and "true and actual value" as provided in section 1143 which may be established by any competent evidence inclusive of or in the absence of evidence of market value. Logically, this leads to the untenable conclusion that while "present true and actual value" is the acme of valuation for the purpose of as· sessment but can only be attained by satisfying the require· ment of establishing "fair market value" yet it is achieved by failing to meet that very prerequisite. The vice in that seems to lie in the premise which is that section 1149 as that section is captioned, is a "rule of valuation", instead of being identi· fied as what it really is, viz., an expository provision, definitive of what is meant—or rather what is not meant—by the real "rule of valuation", viz., section 1143, i.e. "present true and actual value." That is, that values determined from evidence of forced or auction sales are not competent to establish "pres· ent true and actual value" and that the statute contemplates a value established in usual course of trade in such a market only as is mentioned in the *Underwood* case, p. 336. That connotes, of course, that the statutes provide no means for proving the value of property for which there is either no market or such as produces no index of fair market value. That is true and so stated by the majority opinion in the *Underwood* case. So that evidence of value on a theoretical basis is received not because it complies with the literal re· quirements of the statute, but out of sheer necessity lest prop· erty go untaxed and as a pure expedient.

Adopting plaintiff's own premise in argument that "fair market value" and "present true and actual value" are synon· omous, it follows that section 366c, *supra,* in effect, directs that its real property be assessed in the same way as is prescribed for that of all others in section 1143, viz., at its "present true and actual value" and its personal property by the other equiv· alent, viz., its "then actual valuation" as provided in section

1147. It results that no rule was ordained in section 366c, *supra*, especially applying to the property of utilities or different from that applicable to real and personal property, generally. It likewise follows that in the absence of evidence of fair market value, at least, the value of plaintiff's property could be established by evidence of any character competent for the purpose, inclusive of that of the reproduction cost less depreciation. *Underwood Typewriter Co. vs. Hartford, supra,* 337; *Somers vs. Meriden, supra,* 10.

Paragraph 1 of plaintiff's remonstrance is overruled.

## ASCERTAINMENT OF ASSESSABLE VALUES BASED ON DEPRECIATED REPRODUCTION COSTS

*Failure to give effect to market values of certain elements; electric transformers, meters, wire and other elements of electric distribution system.*

The Report predicates the findings of value of electric transformers and motors, electric wire, certain other articles forming part of its electric manufacturing plant and gas compressors upon estimates of depreciated reproduction costs, and in so doing gives no effect to market values of such properties which plaintiff claims are shown to exist in certain of the subordinate facts recited. As a result it is contended that the valuation of classifications of property in which these items are included are erroneously determined and hence the total value of plaintiff's property for assessment, as the referee has fixed it, is invalid. It is urged that in the presence of such contended market values, the valuations reached concerning such properties should (1) accord with such market values, or (2) such market values should be considered together with estimates of cost of reproduction less depreciation and the valuation for purposes of assessment arrived at by giving effect to both factors. A further contention is that in no event is a valuation for local tax purposes valid when based upon values coinciding with those found from reproduction estimates where there is, also, a market value and the latter is less than that reached upon theoretically found values. The validity of this last mentioned claim may be assumed. *Minnesota Rate Cases,* 230 U. S. 352, 455.

*Market value.*

These grounds of remonstrance, however, must be overruled

because they are all premised upon the proposition that the Report contains findings of facts which establish that there was such a market for properties of the kinds in question as would suffice to furnish the foundation of an ascertainment of market values therefrom. The character of such a market is described in *Underwood Typewriter Co. vs. Hartford, supra,* 336, in discussing the requirements of section 1149, as follows: "It is also evident that the words "market value" in this statute means a value in a market, in a place or in conditions in which there are, or have been or, will be within a reasonable time, willing sellers and able and ready buyers of property like that to be assessed, and in which sales are or have been made, or may fairly be expected, in the usual and natural way of business." *Standard Oil Co. vs. Southern Pacific Co.,* 268 U.S. 146, 155.

It is obvious that the minimum requirement that the plaintiff is under the necessity of satisfying under this definition is a value in a "market" of some species. The existence or nonexistence of that is, of course, a matter of ultimate fact to be determined by the referee from the subordinate facts.

*Non-existence of market.*

The referee's final conclusion is stated in paragraph 100 of his Report as follows: "I find that there was no existing market for used gas and electric machinery or equipment in 1931 and 1932 in which the appellant could have sold any substantial part of the items listed in Exhibits FFF and BBBB or any of its gas compressors at any ascertainable price or prices." It would appear from the briefs that the parties have sought to substitute for this, by stipulation, a paragraph originally numbered by them "99c." It was permissible for them to add any subordinate fact upon which they might agree, leaving the ultimate facts to be determined by the Referee, himself. The final conclusion, however, was for the referee to make and that involved an exercise of the judicial function and so is not a subject for modification by the parties. The statement made in paragraph 100 will be treated, therefore, for present purposes as remaining as a part of the Report and paragraph 99c as one of a statement of subordinate fact to be considered with the contents of paragraphs 96-99b, both inclusive. The real question then is whether the court can say that such ultimate fact cannot stand because the subordinate facts do not fairly support it.

The subordinate facts referred to, in substance, describe the following situation: Sales of equipment of the type listed in Exhibit FFF were principally effected by brokers who charged a commission as and when they found a buyer for such items; that listed in BBBB were principally affected through a wholesaler buying for his own account and this customarily required reconditioning and a guaranty in order to effect a sale to the ultimate user (par. 97); that there was no active market for used gas and electric machinery and equipment since "the panic of 1929 and during the years 1930, 1931 and 1932" (par. 98), and no evidence of any sales at any prices of any gas or electric machinery or equipment in the years 1931 and 1932 (par. 99), and the only values such as experts "believed a purchaser would pay . . . in the market available," (par. 99), although such machinery and equipment "could have been sold for some price." (par. 100.)

*Time as to which existence of market is to be considered.*

The time as of which values are to be determined for purposes of local taxation is the assessment date, or in this case the first day of October in the years 1931 and 1932, respectively. The conception of a market value such as will furnish the basis of valuation as stated in the *Underwood* case, *supra,* is a "value in a market, in a place or in conditions in which there are, or have been or, will be *within a reasonable time,* willing sellers and able and ready buyers of property like that to be assessed . . ." It is apparent from the subordinate facts summarized above, that the referee was justified in concluding that there not only was no market at or near to the assessment dates in the years 1931 and 1932, but, also, none of any kind "within a reasonable time" prior to either of such days, and that the only circumstance offered upon which to base a contention that the property in question had a sales value at or about such times, was such as consisted of mere speculation. The consideration that notwithstanding this, such machinery and equipment "could have been sold at some price", as plaintiff insists in argument, is the negation of a value emerging from a market. The contention that a market for junk copper constitutes a market for insulated wire, is obviously untenable.

The following paragraphs of plaintiff's remonstrance are overruled, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 17, because the premise upon which their validity depends is not present.

## DEPRECIATED REPRODUCTION THEORY—
## ELEMENTS

*Contractor's profits.*

It is stipulated that the estimated depreciated reproduction cost of plaintiff's gas distribution system "did not include a ten per cent contractor's profit in materials entering into gas mains, services and regulator stations which can be, and occasionally have been bought by the appellant at current prices and delivered to contractors for installation"; likewise, with respect to the purchase price of transformers and other electric equipment. The reason for the omission of this element is "the assumption that in building up a theoretical cost of reproduction less depreciation for taxation, the taxpayer is entitled to have preventable contractor's profits omitted." (par. 53.)

In assessing property for the purpose of taxation, no concern can be had with the cost of the subject-matter of valuation, except as that may be an aid as a circumstance to be considered with all others. The sole question is what is its "present true and actual value?"—not what did it cost?

That is ascertained by inference from its market value if the existence of a market is established and if this is not discoverable from the evidence, then its probable market value must be determined from other competent evidence. If the latter be or include cost of reproduction less depreciation, the thing to be reproduced is the identical plant which is the subject of valuation. In such case, the actual moneys expended in building the plant is of no concern. The important consideration is what it would cost to reproduce it as of the time its value is to be determined. *Natural Gas Co. of W. Va. vs. Public Service Comm.*, 95 W. Va. 557, 121 S.E. 716, 722. "Reproduction value....is not a matter of outlay but of estimate." *Ohio Utilities Co. vs. Public Utilities Comm.*, 267 U.S. 359, 362, 45 Sup. Ct. 259, 69 L. ed. 656. Contractor's profits are ordinarily to be included in an estimate of the reproduction cost. *Natural Gas Co. of W. Va. vs. Public Service Comm.*, supra.

If the Report contained a fact showing that public utilities companies generally in Connecticut, or especially in that part of the state serviced by plaintiff, would ordinarily be able to make purchases of materials such as concern is had with here

under conditions eliminative of contractor's profits thereon, there would be basis for making a like allowance here. For, from such a circumstance it might be inferred that a general custom exists by which public utilities companies are able, generally to make such savings. In the absence of such a finding the fact that the plaintiff succeeded in doing so is immaterial since no inference can be drawn from such a circumstance that if the items in question were to be installed as of the assessment dates, a like savings could be made.

Paragraph 1 of part C of defendants' remonstrance is sustained and the Report is corrected by adding thereto the following:

|  | 1931 Reproduction less depreciation | 1932 Reproduction less depreciation |
|---|---|---|
| Gas distribution system | 31,738 | 30,426 |
| Electric distribution system | 17,149 | 14,724 |

*Cost of installing gas and electric meters on private property of consumers.*

Included in the depreciated reproduction value of plaintiff's gas distribution system is an item of meter installation which on the list of 1931 is found to be $41,435 and on that of 1932, $41,304; likewise with respect to plaintiff's electric distribution system, which is ascertained on the list of 1931 to be $15,938 and on that of 1932, $15,732. The parties have stipulated that these items represent an "expense incurred wholly in placing . . . meters on the property of the plaintiff's customers."

*Meter installation on private property of consumers as operating expense.*

Undoubtedly, in reproducing the value of the plaintiff's plants, the meters owned by it must be included since they are, of course, tangible personal property; this has been done. Their installation on the property of the consumers, however, does not represent an investment either in the meter or anything else. Certainly, the expense of removing them from time to time can hardly be said to be an outlay which leaves anything tangible in its wake. The placement of them on the properties of patrons and their removal therefrom is a necessary concomitant of doing business and so is related to cost of

operation. It is not the forte of this decision to determine the proper allocation of such an item in the construction of a rate base. Outlays of the character are ordinarily included and allowed in that process.

Concern is had here with real or tangible personal property only. It is not perceived that the expense of attaching or removing such meters from time to time falls within either of these classes, nor that the same produces any accretion of value to any of plaintiff's physical properties and thereby adds to the worth of any separate article of property or to the tangible distribution systems as distinguished from going concern value.

Paragraphs 15 and 16 of plaintiff's remonstrance are sustained. Accordingly, the value of plaintiff's gas distribution system as found by the referee is to be reduced by deducting the sum of $41,435 from the same in the 1931 list and $41,304 from it as it appears in the 1932 list; from the items designated electric distribution system as found by the referee for the 1931 list, there is to be deducted $15,938 and from the same item as it appears in the schedule of found values in the 1932 list, $15,732.

*Extra cost of placing conduits underground and manholes on street surface by reason of actual and anticipated municipal requirements; properly included in estimated reproduction value.*

A great part of plaintiff's electric distribution system consists of conductors placed in conduits, underground with manholes at the street surface. This method of installation, the Report finds, has been adopted because of "actual or anticipated municipal requirements and at the request of municipal authorities." "Underground installation of electric wires is about ten times as expensive as overhead installation and is of no more utility then is overhead installation." The depreciated reproduction costs of such manholes and conduits is found by the referee to total $174,986 as of October 1, 1931 and $144,860 as of October 1, 1932, while that of underground conductors is placed at $51,680 on the 1931 and $44,806 on the 1932, lists. All of these elements are included in the total value of plaintiff's electric distribution systems for each of the tax years named. Plaintiff contends that in estimating the value of its properties on a reproduction less depreciation basis, the calculations should be "confined to that

type of physical set-up required by strictly business needs and that it should not be taxed for extra expenditures which do not fall within that category or add to the utility or earning power of the plant."

These contentions skirt closely to certain principles often urged in rate cases. As previously observed, the objective of the use of the depreciated reproduction cost method is to theoretically reproduce the property to be evaluated as it is, and in the conditions which surround it. So far as the Report explains, the additional cost involved in underground installation here is confined to the necessity of using more expensive material and greater labor outlays in fabricating, connecting and installing it than would be the situation if poles, for example, were to be erected and the wires strung from them and the other incidental equipment attached to them and do not include costs of interment such as excavation and backfill.

In *Worcester Electric Light Co. vs. Atwell*, P.U.R. 1929B, 1, 42, the commission in valuing the plaintiff's physical properties in a rate case went to greater length than is required here, in holding that the cost of constructing an underground duct for the city's requirements in connection with that of ducts for its own use was a proper element to be included in the reproduction cost element of the company's plant. It is, of course, unnecessary to determine whether such a factor could be properly included in a reproduction cost of such a plant for purposes of local taxation, but the decision is of importance as holding that additional cost of construction due to municipal requirements, the value derived from which inheres in that of the physical plant, is properly to be taken into account in reproducing the cost of such plant on a theoretical basis. With its rationale to that extent and for the reasons noted in the foregoing the increased costs in question due to actual or anticipated municipal requirements appear to be properly included in the estimated depreciated cost of reproduction of plaintiff's electric distribution system.

Paragraph 14 of plaintiff's remonstrance is overruled.

*Excavation, backfill and paving; should not be included in estimated reproduction costs.*

The referee finds the depreciated reproduction cost of street excavation and backfill for the interment of plaintiff's

gas and electric distribution systems to be $310,000 as of October, 1, 1931, and $285,500 as of October 1, 1932; and that of pavement cutting and replacement incidental to such ditching, $449,350 as of October 1, 1931 and $446,850 as of October 1, 1932. None of these elements were included in the determined depreciated reproduction cost of either the gas or electrical distribution systems and defendants remonstrate against their omission.

Expenditures for excavation and backfill incident to interment of distribution systems such as plaintiff's are ordinarily included in a rate base (*See Columbus Gas & Fuel Co. vs. Columbus,* 17 Fed. (2d) 630, 633, where this was apparently assumed), as are the costs of cutting and replacing pavements arising in connection with the original excavation (*Columbus Gas & Fuel Co. vs. Columbus, supra,* 633, 634), but not otherwise. *Consolidated Gas Co. vs. New York,* 157 Fed. 849; *Brooklyn Borough Gas Co. vs. Prendergast,* 16 Fed. (2) 615; *People ex rel. Kings Co. Lighting Co. vs. Willcox,* 210 N.Y. 479, 494, 104 N.E. 911; *and see, Des Moines Gas Co. vs. Des Moines,* 238 U.S. 153, 171, 59 L. ed. 1244, 35 Sup. Ct. 811. It has, however, also been observed "that....paving whether that which was there at the time of original construction or that which is presently there, does not belong to the plaintiff, that it does not add materially to the efficiency of the conduits and that it bears no part and gives no aid in enabling the plaintiff to perform the service to the consumers." *Worcester Electric Light Co. vs. Atwell, supra.*

However, this is not a rate case. Concern here is had only with tangible personal property for plaintiff's distribution system. *Conn. Light & Power Co. vs. Oxford,* 101 Conn. 383, 394, 395. The property which is the subject of assessment is that which physically constitutes the distribution system. Monies expended in interring it are no part of such systems and confer no value upon them as such, nor does the pavement which lies above them. If such sums be capable of inclusion in a theoretical reproduction of their value that can only be so, if in fact their interment adds value to them by reason of their installation in that condition, but as is evident that is not so. Neither can effect be given such costs as the equivalent of value conferred as installation costs, as is held *supra,* as in the case where machinery is installed in a building. The distinction is obvious. For in the latter case it is the building which is the subject of valuation and the attachment of ma-

chinery to it is an element of value infused into the structure itself by force of such circumstance, while in the case of installation of the distribution systems in question in the ground, no subject of taxation—not even such systems—is the recipient of any increment of value as a result. It is the conclusion that for purposes of local assessment of personal property within the concept of the applicable statutes the depreciated reproduction cost of excavating, placing backfill, pavement cutting and replacement are none of them proper elements to be included in the estimate.

Paragraph 2 of part C of defendants' remonstrance is overruled.

## DISCRIMINATION

*Correction of referee's finding—disproportionate assessment. ment.*

The Report states that: "The assessment of 1931 was made by the board of assessors . . . on the basis of an 80 % valuation of all taxable property . . . as stated by the assessors in their sworn return to the State Tax Commissioner", and that: "The board of relief, in increasing the plaintiff's 1931 assessment applied what they believed to be a 100 % valuation of the plaintiff's property. The only other taxpayers whose assessments were increased by the board of relief in 1931 were the Stamford Water Company and the Telephone Company and 11 individual taxpayers."

Upon the basis of these subordinate facts the referee concludes (par. 104): "I find that the action of the board of relief in applying a 100 % valuation to appellant's property for taxation as of October 1, 1931 was discriminatory in that it applied a one hundred per cent standard of taxable value to the appellant's property, although all other property in the town and city of Stamford with the exceptions already noted, was taxed at an 80 % standard of taxable value as of that year."

Defendants claim that certain of the subordinate facts upon which this conclusion predicates are found without evidence and it should, therefore, be expunged and that there should be substituted in its stead as an admitted and undisputed fact a paragraph to the effect that: "The board of relief applied a 100% rule of value to *all* taxable property in the town and city of Stamford on the assessment list of October 1, 1931."

Transcripts of the testimony are annexed to defendants' remonstrance as well as to plaintiff's answer thereto. Certain subordinate facts are, also, added by stipulation. From these it appears that 18,140 individual lists made up the grand list in the hands of the assessors, which were valued at a total of $143,663,549, included in which was the assessment of plaintiff's property at $5,676,980. To the number of lists delivered to the board of relief, there were added three others totaling $4,830,000. Reductions were made by the latter body in 99 individual lists as the result of appeals from the board of assessors, totaling $1,870,960 and increases, aggregating the total of $2,058,020 in 11 other lists of which $988,000 was assigned to plaintiff and $1,040,000 to The Stamford Water Company, thus leaving but $30,000 of such increases allocated to the other nine taxpayers whose lists were so increased. The valuations placed by the board of assessors on the remaining 18,030 lists were not disturbed by the board of relief.

It is quite true that the circumstance, standing alone, that the board of relief applied what they believed to be a 100% valuation in determining the assessable value of plaintiff's property while the assessors used 80% and that this resulted in a material increase, is not, in itself necessarily indicative of a disproportionate assessment in plaintiff's list, for what the assessors considered an 80% basis might have been the same as what the board of relief believed to be 100%. That would be so even though plaintiff's was the only list so increased, for even such a situation is explicable on the same theory. So, too, the fact that plaintiff's assessment as made by the board of assessors was approximately .039% of the total of the grand list and about .046% as fixed by the board of relief for that, too, might be the product of a determination that the assessors' 80% as the equivalent of the board of relief's 100% was properly used in valuating the properties of all others, but misapplied to plaintiff's. Whether this was so, or that the increase made by the board of relief resulted from the employment of a greater percentage to plaintiff's list than that applied to all others (with the exceptions above mentioned) is a question of fact. In resolving this, it was, of course, proper for the referee to consider, on the one hand, the testimony of one of the members of the board of relief to the effect that the latter body valued all taxable property on a 100% basis, aided by the inference to be drawn from the circumstance that no other member of the board testified other-

wise. *Slosberg vs. Norwich,* 115 Conn. 578, 579. On the other hand, the referee was entitled to give full effect to the fact found by him—and not challenged in the plaintiff's remonstrance—that the valuation of plaintiff's list by the board of assessors represented, in actuality, 80% of its full value and on this basis—considering particularly the comparatively large number of lists which were not changed while the plaintiff's total, with that of The Stamford Water Company, were very materially increased, have come to a logical conclusion in deciding that plaintiff's property was assessed at 100% of its value while the property of all others was valued on a basis of 80%. The credibility to be attributed to the testimony of the member of the board of relief whose statement was susceptible of a contrary effect, considered together with all the other facts, was a matter to be determined by the Referee and an important one in view of the situation disclosed by the subordinate facts and the transcripts which have been submitted. As the situation lay in the light of all of this the real question was not whether there was no evidence but whether the evidence which there was, was sufficient to justify the conclusion reached. This is concerned with the weight, rather than the lack of evidence. "The weight of the evidence is for the committee, and his finding upon the evidence is conclusive upon the parties, and they cannot retry the question to the court." *Ferguson vs. Cripps,* 87 Conn. 241, 245.

Paragraphs 1 of part A and 1 of part B of defendants' remonstrance, are overruled.

*Application of disproportion to individual items in list.*

*Material and supplies.*

In view of the foregoing ruling the referee's finding that the assessment made by the board of relief on plaintiff's 1931 list, was disproportionate, stands. In computing the amount of reduction to which plaintiff is entitled because of such discrimination (Report, Schedule A annexed to stipulation, paragraph 116) the referee has applied the percentage to the total of plaintiff's list. Defendants ask that there be added to the Report a paragraph to the effect that the value of the item of materials and supplies constituting part of plaintiff's list was not in dispute between the parties and predicates its right to have this inserted upon certain statements made by counsel for the plaintiff, a transcript of which is attached to the remonstrance. It developes that the only materiality which

this has concerns the question of whether the "found" value of this item, viz., $245,000 is, as one of the items composing the complete list, subject to a reduction for discrimination or whether, in view of plaintiff's counsel's statement, it is to be subtracted from the total of the list for the purpose of giving effect to the percentage of disproportion and the percentage of reduction then applied to the balance.

Plaintiff's counsel's statement as it appears in the transcript is this: "We are not questioning the land values or the material values. As to the land values for 1931 and 1932 and the values of the material and stock on hand for both years we do not care to undertake to question the correctness of those assessments."

Whether it was meant by this that the values inserted by the board of relief opposite these items in plaintiff's list were neither excessive nor disproportionate or merely that they were not excessive and so would, nevertheless, remain subject to reduction if disproportionate does not appear. Upon the basis of plaintiff's counsel's representation, counsel for the defendants produced no evidence of the value of these items.

It thus appears that the effect of this ground of remonstrance is to ask the court to tell counsel what they themselves intended by the understanding had between themselves as a result of which both of them refrained from submitting evidence on the point. Apparently, there was no doubt in the mind of the referee concerning the subject. He interpreted the statement to mean merely that the plaintiff conceded that the valuation of this particular item as fixed by the board of relief represented its value on a 100% basis and so, to the extent that it constituted a part of the complete list of plaintiff's property which as a whole was, as he found, subject to reduction to the extent that it was disproportionate, was not to be treated any differently than any other item appearing in it, the value of which he determined from the evidence produced before him. There is nothing in the Report, nor elsewhere in the record, which would justify interference with this conclusion. Indeed, the logic of the situation supports it.

*Disproportionate assessment concerned only with total of list.*

Thus, the appeal is from the action of the board of relief with respect to the total valuation placed on plaintiff's list and the judgment must be in the list as a whole. *Greenwoods Co. vs. New Hartford,* 65 Conn. 461, 465. The inquiry

into the values of the several items constituting said list is not for the purpose of enabling the court to grant relief as respects such individual items, but only to enable it to determine whether the list as a completed unit is validly assessed. *Green-woods Co. vs. New Hartford, supra,* 465. It is evident that this was the only purpose served by valuing the several items making up plaintiff's list. The failure to introduce evidence concerning the value of the items in question was merely a concession that as respects such items, the board of relief had correctly valued them on such 100% basis and so to dispense with proving something that was admittedly true. The question of whether plaintiff's assessment was disproportionate on whatever basis of valuation it was fixed is concerned only with its total valuation. The valuations placed on the items in question are component parts of that total and, otherwise are without significance. As such factors, it is palpably immaterial whether the values attributed to them are the result of evidence establishing them or conceded to be correct. In either case they are inseparable from the list as a whole.

*Materials and supplies, land and automobiles.*

Since the question of disproportion is concerned only with the list in its total, and not at all with any of the individual items which compose it, as such, it is self-evident that no question can arise or be considered which seeks to predicate a claim on the disproportion or lack of disproportion of any single item. Defendants advanced their claims in this respect as applicable not only to the item of materials and supplies in the sum of $245,000 and land in the sum of $274,370 but, also, automobiles in the sum of $9,210. It results that paragraph 2 of part B and paragraph 6 of part C of defendants' remonstrance are overruled. For reasons noted *supra* so, also, is paragraph 7 of part C

*Failure of assessors to allow plaintiff extra 25% reduction of machinery item allowed others not evidence of disproportion in list as a whole.*

With respect to its 1932 list the plaintiff claims in paragraphs 20 and 21 of the remonstrance that the Report shows that it was subjected to discrimination. The assessors valued an item denominated "machinery and equipment" at $1,960,000 and the board of relief increased it to $2,550,000. The alleged discrimination occurred, according to paragraphs 10 to 12D, both inclusive, of the stipulation amending the Report

in the action of the assessors, in failing to allow a deduction of 25% applicable to such items which, it is stated, was taken from the lists of some 16 or more other owners of machinery, who together possessed 95% of all the machinery in Stamford.

In brief, it is said it happened in this wise: "The Municipal Service Company in December, 1931, had entered into a contract with "the newly created taxation board . . . for the valuation for taxation of all property in the town and city of Stamford" and essayed to perform its duties thereunder with respect to tax lists required to be filed in October, 1932. As part of its method for valuing machinery it allowed a deduction from a value obtained by an arbitrary but uniform formula of 25% for actual obsolescence, condition and marketability. This system was applied to machinery owned by persons having "small lots" thereof and to that possessed by the plaintiff and The Stamford Water Company. Manufacturers owning 95% of all the machinery in Stamford had combined together in a body known as the "Manufacturers' Council" and for some unexplained reason, "it was deemed impracticable for the Municipal Service Company to make a detailed inspection or appraisal of the machinery belonging to" the members constituting that body, as had been done in the case of plaintiff and the smaller owners of machinery. The members of the Manufacturers' Council themselves, agreed to apply the formula so used by the Municipal Service Company, and to submit the results of their labors to the Municipal Service Company "for its use in assessing machinery as of October 1, 1932." This understanding, the Manufacturers' Council failed to fulfill and had not done so "by the fall of 1932." "Negotiations then ensued during which the Manufacturers' Council claimed that they were entitled to a further 25% deduction on account of a fall in the value of machinery since the formula had been submitted in the spring of 1932." The Municipal Service Company agreed to this and it was allowed. The assessors accepted it, to, but never gave the benefit of it to the plaintiff, or The Stamford Water Company or the other small owners of machinery. Had plaintiff been allowed the extra 25% which the Manufacturers' Council exacted for its members, the assessment of its machinery according to the formula would have been less than it was set in its list for, by the sum of about $220,663. Whatever may be said of the lack of fair dealing in the conduct described, it

avails plaintiff nothing in the instant proceeding, for as already pointed out, in an appeal from the doings of a board of relief, it is the proper assessment of plaintiff's list as a whole which is the issue. *Greenwoods Co. vs. New Hartford, supra,* 465.

Palpably, even though the valuation placed on its machinery was relatively higher than that placed on that of the other 95 % it would not necessarily result that the total of plaintiff's list was likewise relatively higher than that of other taxpayers as a group, since the excess in the one item might well be balanced or even outweighed by relatively lower valuations placed on other items of its property. Again, the claim is directed against the assessment as made by the board of assessors from whose action no appeal was taken to the board of relief. Any vice in plaintiff's list "as it left the hands of the assessors, may . . . . have been purged by the doings of the board of relief" or, if no change was made the board may have decided that the value as determined by the assessors was, in fact, the "true present value", notwithstanding any artificial method by which the assessors arrived at it. *Monroe vs. New Canaan,* 43 Conn. 309, 313.

Indeed, the gravemen of plaintiff's contention is "that where a uniform method of arriving at taxable values of a certain class of property is used by the assessors and applied to substantially all of such property in the town, it is unlawful for an assessment in such class of property of the plaintiff to be made higher than would result from the application of the same method to the plaintiff's property." Insofar as this stresses the factor of "method" it is untenable. The ultimate question is always whether or not an assessment conforms to the statutory rule or (when the claim is made) is disproportionate. The mental processes by which it is reached or the formula employed in so doing are of no consequence if, as made, it satisfies the legal requirements. The "method" cannot sanctify it if it offends against the law and is immaterial if it does not. *Slosberg vs. Norwich, supra,* 580.

Paragraphs 20 and 21 of plaintiff's remonstrance, for the reasons noted, are overruled.

## EXTENT OF RELIEF

*Effect of failure to appeal from assessors to board of relief.*

The plaintiff in its appeal in respect of its 1931 list does not allege that it questioned the assessment of $5,676,980 as made by the board of assessors by applying to the board of relief for a reduction thereof in accordance with the provisions of section 1194 and 1195 of the General Statutes, Revision of 1930: nor that it followed such procedure in respect of its assessment on the list of 1932. On the contrary, the referee finds affirmatively (par. 2) that it did not do so in respect of either of such assessments. The defendants' claim in paragraph 5 of part C of their remonstrance that even though the assessments as made by the board of assessors on plaintiff's 1931 list and by the assessor on the list of 1932 are excessive—whether because the latter's property was valued higher than its then true and actual value or disproportionately—the Court is without power in this proceeding to reduce it below the figures at which the assessors determined it.

Whether the power of the Superior Court in such a proceeding as the instant one is so restricted has not been definitely determined. The question was adverted to in *White vs. Portland*, 63 Conn. 18, 25, and dismissed without comment other than as appears in the following excerpt: "Whether a party may appeal in these cases, and then ask the Superior Court to grant relief not claimed before the board of relief, is a question we need not determine; for it is evident that the appellants have not been wronged." The subject has been no more illumined since that case was decided in 1893. It is consequently necessary to rest the determination here, on principle.

*Appeal to Superior Court is from doings of board of relief—not assessors.*

A taxpayer claiming to be aggrieved by an excessive assessment of his property prior to the time when an appeal therefrom to this Court was provided had no redress in that respect, unless he appealed to the board of relief, within the period specified in the statute. *Monroe vs. New Canaan*, 43 Conn. 309, 312; *State ex rel. Coe vs. Fyler*, 48 id. 145, 159. There never has been a remedy by appeal to the courts from the doings of assessors and the statute under which the instant proceeding pends provides none. The latter by its terms is

limited to cases where one is aggrieved "by the action of the board of relief...." Gen. Stat. (1930) §1200. The doings of the board of relief which may furnish ground for appeal are plainly those respecting which the statute authorizes it to function and are divided into two classes, viz.: (1) to correct errors of valuation, etc., in the list of the person appealing to it and (2) to "equalize and adjust the valuations and assessment lists of (the) town." Gen. Stat. (1930) §1194. In the one case, the board acts in the capacity of a reviewing body, and in the other, exercises powers delegated to it exclusively and so, originally. *Monroe vs. New Canaan, supra,* 313; *State ex rel. Coe vs. Fyler, supra,* 159. Palpably, reason for appeal to the Superior Court from the manner in which a board of relief performs its duties may be of either one or both of these characters. It inevitably involves the doings of the board in respect of its own original functions when the board increases an assessment over the values fixed by the board of assessors and the power of the court to examine into its conduct is thereby invoked. The fact, however, that a board of relief fails to reduce an assessment made by the board of assessors, in itself, can give a taxpayer no ground of appeal for it has no duty to perform with respect to any individual list in that respect, unless it is called upon to review same by appeal to it within the period limited, by the aggrieved taxpayer. If its power to review the handiwork of the assessors in that respect is not invoked, it does not act and if it does not act its "doings" in that regard can give rise to no aggrievement upon the part of the affected taxpayer. If, under such circumstances, the court were to examine the assessment made by the assessors and reduce it, it would be indulging in circumvention, for as noted *supra,* there never has been, and there does not now exist any proceeding by appeal which authorizes it to do so. The authority of the court to review and give relief from an excessive or disproportionate assessment made by a board of assessors is indirect and incidental and exists only insofar as such action is involved in the doings of the board of relief and cannot inhere in the latter unless the taxpayer himself injects it by exercising his statutory right of appeal to the latter body. The nature of the remedy provided by the statute and the time limitation imposed by section 1195 appear to contemplate that the taxpayer will seasonably take the available and proper means to ascertain whether the valuation placed upon his property is correct and if it is erroneous

resort to appeal (*Pitt vs. Stamford,* 117 Conn. 388, 394) and if he fails to make use of his statutory remedy to seek a correction of the claimed errors by the board of assessors, "he should now, upon every principle hold his peace." *Monroe vs. New Canaan, supra,* 312. *See, also, People ex rel. Western Union Tel. Co. vs. Dolan, et al.* (N.Y.) 27 N.E. 269, where it is said that such conduct constitutes laches.

*Limits of reduction and increase in assessment over that determined by board of relief.*

It is held that this court on appeal from the doings of the board of relief will in no case reduce an assessment below a figure which the aggrieved taxpayer asserts is proper (*Randell vs. Bridgeport,* 63 Conn. 321, 324), nor higher than that determined by the board of relief. *Greenwoods Co. vs. New Hartford,* 65 Conn. 461, 465. The defendants contend that by the plaintiff's failure to appeal to the board of relief, it impliedly asserted the correctness of the assessments as made by the assessing officials and is now estopped to assert otherwise. Whatever merit there may be in this contention (and there is much) the gravamen of the ruling on the point is placed here on the basis discussed, *supra,* viz., that since the plaintiff failed to appeal to the board of relief, the latter had no occasion to review the assessments made by the assessing officials and hence, could perform no act in respect thereto which could be the subject of appeal to this court. Consequently, this court is without jurisdiction to review the assessment as made by the assessing officials or to extend any relief in that regard. Which means, of course, that the appeal is effective only to the extent that it presents for determination the doings of the board of relief in its role of equalizing and adjusting all of the lists insofar as its action in so doing resulted in an excessive or disproportionate assessment being imposed. The total valuations of plaintiff's lists, respectively, cannot, therefore, be reduced below the assessments made by the assessing officials in 1931 and 1932, viz., $5,676,980 and $4,752,380, respectively.

Paragraph 5 of part C of defendants' remonstrance is sustained.

## FINDINGS OF ASSESSABLE VALUES

The valuations of the several items of which plaintiff's list consists conform for the most part to estimates of depreciated

reproduction costs, and from this circumstance, plaintiff re-monstrates on the premise that the referee instead of giving effect to such theoretical estimates as evidence to be considered in determining value, has accepted and employed them as the equivalent of values in themselves, and so has failed to find assessable values, the schedules attached to paragraph 116 be-ing in this view but a recapitulation of evidence. As noted in *Bridgeport Brass Co. vs. Drew*, 102 Conn. 206, 212, theo-retical methods of establishing value are at best processes of approximation. Such estimates, of course, do not establish value in themselves, but are evidence to be considered in aid of the ascertainment thereof. *Underwood Typewriter Co. vs. Hartford, supra,* 337; *Minnesota Rate Cases,* 230 U.S. 352, 434. Which, in turn, as applied to the instant proceed-ings means that the Report must exhibit the referee's own conclusions as concerns the values found, from such evidence where predicated thereupon.

The valuations set out under the column in Schedules A and B under the caption "As Found", are, without doubt, meant to satisfy this requirement and to set forth the referee's own final conclusions from the subordinate facts which appear in the Report. The circumstance that these chance to coin-cide in so large a degree with estimated depreciated reproduc-tion costs is immaterial so long as the values placed on the several items so determined from such evidence do not ex-ceed such estimates (*Minnesota Rate Cases, supra,* 455), and represent the referee's own judgment.

Paragraph 2 of plaintiff's remonstrance is overruled.

## CORRECTIONS TO REPORT

From the foregoing it appears that the Report should be altered only in the following particulars, viz., by adding to the gas distribution and electric distribution systems, on the lists of 1931 and 1932, respectively, the found factor of "Con-tractor's Profits", and by deducting from each of such lists in each of the years mentioned, the factor of cost of installing meters on the private properties of consumers; and with re-spect to the 1931 list limiting the extent of reduction for dis-proportionate assessment to the total values as determined by the board of assessors. This results in the following correc-tions, to wit:

## LIST OF 1931

| | | |
|---|---:|---:|
| Value as found on a 100% basis............ | $5,616,021 | |
| Add Contractor's Profits applicable to gas distribution system................................ | 31,738 | |
| Ditto, electric distribution system......... | 17,149 | |
| | $5,664,908 | |
| Deduct cost of installing gas meters, applicable to gas distribution system | 41,435 | |
| Ditto, electric distribution system........... | 15,938 | 57,373 |
| Total of list on 100% basis as corrected ................................................................... | | $5,607,535 |
| Total as reduced due to disproportion | | $4,486,028 |
| Total as finally corrected, due to non-allowance in full of factor of disproportion, viz., as assessed by board of assessors ......................................................... | | $5,676,980 |

## LIST OF 1932

| | | |
|---|---:|---:|
| Value as found........................................................ | $5,039,206 | |
| Add Contractor's Profits applicable to gas distribution system................................ | 30,426 | |
| Ditto, applicable to electric distribution system ................................................................. | 14,724 | |
| | $5,084,356 | |
| Deduct cost of installation of gas meters, applicable to gas distribution system ................................................................. | 41,304 | |
| Ditto, electric distribution system........... | 15,732 | |
| | | 57,036 |
| Total value of list as corrected................. | | $5,027,320 |

As so corrected, the Report may be accepted.