(No. 6806. December 19, 1940.)

IN THE MATTER OF THE APPLICATION OF THE PACIFIC TELEPHONE AND TELEGRAPH COMPANY FOR AUTHORITY TO INCREASE RATES.

[113 Pac. (2d) 798.]

REHEARING DENIED MAY 28, 1941.

Jess Hawley and George Erb, for Appellant.

J. W. Taylor, Attorney General, and D. W. Thomas, Assistant Attorney General, for Public Utilities Commission.

Durham & Hyatt and Marcus J. Ware, for Protestants.

HOLDEN, J.—Pacific Telephone and Telegraph Company (a California corporation, hereinafter referred to as the company), is, and for many years has been, engaged in rendering telephone service to the public, both interstate and intrastate, in the states of California, Oregon, Washington, and in that portion of Idaho embracing Lewiston and generally the territory between Lewiston and Grangeville. March 22, 1938, the company filed an application to put into effect a new schedule of rates, increasing local exchange rates (annexing the proposed schedule to such application). The application alleged:

"That the exchange rates, charges, and rentals set forth in Exhibit 'F' [the proposed new schedule of rates] and which said rates, charges, and rentals this applicant seeks an order from this Commission authorizing this applicant to place in effect on the first billing dates subsequent to April 22, 1938, when placed in effect will, in the belief of the applicant, enable the applicant to meet its operating expenses and taxes in the State of Idaho and in addition obtain a return upon the cost of its property in the State of Idaho devoted to the public service but that such return will be less than one per cent either during the year 1938 or so far as can now be estimated or determined during the year 1939.

"Wherefore, applicant asks that the Public Utilities Commission of the State of Idaho make its order authorizing applicant to place in effect on the first billing dates subsequent to April 22, 1938, the schedule of rates set forth in Exhibit 'F' herein."

April 15, 1938, a hearing on the application began before the Commission, at which time counsel for the Commission made the following motion:

"At this time I move for a dismissal of the cause, on the ground that there is a previous action pending for valuation for rate fixing purposes, commenced in the year 1927 and never terminated in this Commission."

Discussing the motion counsel for the company (Mr. Rupp) stated:

"I will reply very briefly. It is true that there was a valuation proceeding commenced before this Commission some time in the year 1926 or 1927, and it is true so far as I know . . . that the same was never terminated, but I fail to see how that necessitates the dismissal of the proceeding in this particular case.

"We have filed an application for an increase in rates, and if it should become necessary, or the Commission deems it necessary, after the introduction of testimony, to make a valuation in this case before it comes to a conclusion as to whether the rates should be increased or not, that will be something that will appear from the evidence in this case.

" . . . The Company is not here asking, and the application does not state, that it requests a fair rate of return upon its property in the State of Idaho. On the contrary, the application distinctly states that the rate proposed will not produce, that is substantially any return upon its investment in the property.

" . . . If it should appear later on in the proceedings that a valuation proceeding is necessary before the Commission can form a conclusion, that will be the time to determine that particular matter."

During the course of the hearing, to-wit, April 16, 1938, counsel for the Commission moved:

"I am going to make a motion that the Commission require that the petitioner here, before proceeding further with this case, to file an inventory of their physical properties within the state, designating the exact location of the property within the several counties of the state, showing in detail the cost of construction, together with the depreciation costs incident thereto since construction."

Counsel for the Commission then added the following:

"I move the Commission, in addition to the request I just made, and before proceeding further with this hearing, that the petitioning company furnish the Commission with a statement showing the amount of depreciation in the reserve account applicable to Idaho as of December 31st, 1937, and the amount of money that should have been in the depreciation reserve fund if such fund had been kept in conformity with the law, showing the

amount which should have been deposited in such fund, and the disposition made of such money for the same reason."

The Commission ruled:

"The motion of counsel for the Commission, on his request, to the effect that the petitioner supply the information contained in his motion, will be granted.

"The Commission will recess this hearing to such time as the Commission may, by proper notice to all parties concerned, re-set the same. As soon as the petitioner obtains the information requested, the petitioner will submit copies thereof to the Commission and give the Commission's representatives an opportunity to examine the same, and, if necessary, to go over it with the petitioner's representatives and check it."

\* \* \* \*

"The Commission will give proper notice for reconvening for the purpose of completing the hearing. You will all be duly notified."

In October, 1938, the company advised the Commission its inventory was completed. The Commission then set April 5, 1939, as the date for resuming the hearing on the company's application, at which time the hearing was resumed. Some time after the hearing was concluded, that is to say, September 6, 1939, the Commission made "Findings" and entered the following order thereon:

"Now therefore it is ordered the application of the Pacific Telephone and Telegraph Company for increased rates be and the same is hereby denied."

September 27, 1939, the company filed an application for a rehearing. November 6, 1939, the Commission granted the application. December 11, 1939, a rehearing was had at Boise, Idaho. January 9, 1940, the Commission made "Findings" covering the questions presented on rehearing and again entered an order denying the company's application for increased rates. The company appeals from both orders.

It appears from the company's application it sought authority to put into effect a schedule of rates which would simply enable it "to meet its operating expenses

and taxes in the State of Idaho and in addition obtain a return upon the cost of its property in the State of Idaho devoted to the public service" of "less than one per cent either during the year 1938 or as far as can now be estimated or determined during the year 1939." Nevertheless, the company insists that inasmuch as counsel for the Commission requested it to file an inventory of its physical properties in the state as well as a statement of depreciation (as shown by the record hereinbefore quoted), and further that inasmuch as it supplied the requested inventory and statement (at, it is stated, considerable expense), the proceeding is, in fact, a "valuation hearing," involving the fixing of a fair rate of return, since it is assigned as error and earnestly urged by the company the Commission erred in that it "did not make any finding of a fair rate of return to which appellant is entitled for its services as a telephone company in the State of Idaho." However that may be, the assignment in and of itself, as, of course, intended by the company, presents the question as to whether the Commission erred in failing to find a fair rate of return.

The Commission correctly found and ruled the burden of proof was on the company. (*Mountain View Rural Telephone Company v. Interstate Telephone Company*, 55 Ida. 514, 519, 46 Pac. (2d) 723; *Sawyer v. Mays*, P. U. R. 1920D, 793; *Re Proposed Increases in Freight Rates*, P. U. R. 1918B, 52; *Re American Railway Express Company*, P. U. R. 1921C, 453; *Re Virginia Railway & Power Co.*, P. U. R. 1925B, 14; *Re Viola Telephone Co.*, P. U. R. 1919F, 47; *In re Joplin Waterworks Co.*, P. U. R. 1915C, 125; *Anderson v. Clinton County Telephone Co.*, P. U. R. 1917A, 31; *New Jersey Central Traction Co. v. Board of Public Utility Com.*, 96 N. J. L. 90, 113 Atl. 692, P. U. R. 1921D, 39; *Re Long Island Railroad Co.*, P. U. R. 1918A, 649; *Re United Traction Co.*, P. U. R. 1921B, 638; *Re Rates on Wall Board, Carloads*, P. U. R. 1916E, 109; *Quinn v. Harrisburg Railways Co.*, P. U. R. 1920C, 106; *City of Pottsville et al. v. Pottsville Water Co.*, P. U. R. 1928B, 613; *Re New England Telephone & Telegraph Co.*, P. U. R. 1927C, 348; *Natural Gas Co. of West Virginia v. Public Service Comm.*, 95 W. Va. 557, 121 S. E. 716, P.

U. R. 1924D, 346.) That brings us at once to the decisive question presented on this appeal: Is the evidence offered by the company "unsatisfactory, inadequate and insufficient," as found and held by the Commission? In other words, did the company fail to sustain the burden of proof?

█ The transcript is voluminous—1660 folios. In addition to that, there are 66 exhibits, ranging from a page to 1365 pages. A review and discussion of the evidence, therefore, would extend far beyond the proper limits of an opinion. Although it is quite impossible to review the evidence at length, we direct particular attention to the testimony of Robert P. Judy, general commercial manager, and apparently the "star" witness of the company, called, and with great care, qualified, as an expert. On direct examination Mr. Judy testified:

Q. "Please state your name?

A. Robert P. Judy.

Q. And your residence?

A. Seattle, Washington.

Q. You are employed by the Pacific Telephone and Telegraph Company?

A. Yes, I am employed as General Commercial Manager.

Q. Have you prepared a statement of your experience in the telephone business?

A. I have.

Q. Does the document just handed you, marked by the Reporter for identification as Exhibit No. 50,[1] contain a

---

[1] " . . . . . . . .

Occupation: General Commercial Manager, The Pacific Telephone and Telegraph Company, Washington-Idaho Area.

Education: Pomona College, Claremont, California. A. B. Degree in 1920—Majored in Electrical Engineering and Chemistry. University of California, Berkeley, Post Graduate Work in Chemistry. Six months' practical course in Telephony in Coast Guard at Fort Scott, San Francisco, and Fortress Monroe, Virginia.

. . . . . . . .

Experience: Electrician Sergeant, First Class, in charge of telephones and searchlights for 15th Anti-Aircraft Section, 41st

statement of that experience?

 A. Yes, it does."

\* \* \* \* \*

 Q. "To what extent are you familiar with the company's operations and rate practices in the State of Idaho?

---

 Brigade. Nine months in 1918, including the training and actual service periods.

 Southern California Telephone Company.

1922-1923 Commercial Representative in Los Angeles Business Office, principally engaged in handling telephone service requirements of larger business customers.

1923-1927 Commercial Supervisor on Division and General Office Staff, principally engaged in staff work involving development and application of methods, practices, results, training and equipment in connection with commercial aspects of the telephone business.

 American Telephone and Telegraph Company.

1927-1934 Engineer in various specialized groups of the Operation and Engineering Department, engaged in developing new and improved methods, practices, results, information, training, supervisory materials and technique, plans of organization and equipment in connection with commercial aspects of the telephone business. Includes assistance to various Associated Companies in their introduction and application.

1934-1938 In charge of the Commercial Results and Practices Section in the Operation and Engineering Department, which includes specialized groups working on various commercial administration matters of the type previously mentioned. Includes administration aspects of sales, directory, rate and intercompany operations.

 The Pacific Telephone and Telegraph Company:

Nov., 1938 Appointed General Commercial Manager in charge of the Commercial Department in the Washington and Idaho Area. The work of the Commercial Department includes the handling of the Company's business transactions with its customers (such as requests for new service, additions, changes or disconnections, inquiries regarding services, charges, etc., and collection of the Company's revenue); sale of service; *determination and administration of rates* and rate practices; forecasting growth and revenue; compilation and issuance of telephone directories; and handling the Company's relations with other connecting and wire using companies." (Emphasis ours.)

A. Part of the responsibility of a general commercial manager is to see that the rates for the telephone service are adequate; that they are sufficient to protect the people who put money in the business, provide adequate revenue to take care of the employees on a fair basis, and that the allocation of the charges for the various services are such that they permit the maximum number of customers to enjoy telephone service. Also that these rates and rate practices be administered without personal discrimination between customers. That being part of the responsibilities, I have reviewed pretty thoroughly the situation in Idaho from the standpoint of the rates, and the effect of the proposed application rates, ... "

On cross-examination, he testified:

Q. "What in your opinion, if you know, would be a proper rate to apply at this time to give you a fair return on your investment in your Idaho property?

A. *I would have to make a study to determine that.* [Emphasis ours.] We do not believe that would be the right thing to do, and haven't set up new rates, even on a test basis, to see what could be done.

Q. You are not asking for an increase in order to get a fair return at this time?

A. Not immediately, that is correct. Our principal objective is to get rates which will balance in all these considerations, and will permit us to overcome this situation of having big losses with the hope, we sincerely hope that we will have a return on our investment with these application rates. We even hope, over a period of years, that there would be a fair return, but in my opinion, that is very unlikely. We hope, but nobody can forecast what will happen in 1942 and 1943."

Mr. Judy, the expert, must have known what rates would give his company a fair return on its Idaho investment, in that he testified he had "reviewed pretty thoroughly the situation in Idaho from the standpoint of rates," and yet he carefully avoided answering the question which would have given the Commission that information. Instead, he said he would "have to make a study to determine that." If Mr. Judy, after a thorough review

of the "situation in Idaho from the standpoint of the rates," and with all the evidence offered by his company, could not "determine that"—in other words, if the evidence offered by his company is *not sufficient* to enable him, an outstanding expert, to state what rate would give the company a fair return on its Idaho investment, just how can it logically be insisted the evidence is *sufficient* to enable the Commission to do so?

A painstaking examination and study of the evidence leads to the conclusion the company failed to sustain the burden of proof; therefore, the orders appealed from are affirmed with costs to respondent.

Ailshie, C. J., and Budge, Givens and Morgan, JJ., concur.

## ON PETITION FOR REHEARING,
### (May 28, 1941)

HOLDEN, J. (Stating his views on the petition)— ■ The foregoing opinion was filed December 19, 1940. January 8, 1941, a petition for rehearing was filed. March 12, 1941, appellant filed its brief on petition for rehearing. April 15, 1941, respondent filed its brief on the petition for rehearing, and April 26, 1941, appellant filed a reply brief. Much space is devoted by the respective parties to a discussion of the theory on which the case was tried before the Commission, the theory on which appellant relied on appeal, as well as the theory on which this court decided the case. Appellant states:

"The theory of the Supreme Court decision was not the theory of the appellant on the hearing or of the commission in its refusal to grant increased rates. If we understand and correctly analyze the decision of this Court, it is based upon the theory that the appellant had applied to the Commission for increased rates which would bring to it a fair rate of return upon the fair value of the appellant's property used and useful in the Idaho public service —that the burden of proof showing necessity and right for such increase was upon the appellant—that the Commission rightfully found that the appellant had not borne

the burden of proving that it was entitled to increased rates which would bring a fair return upon the value of its Idaho property; ergo, the Commission's decision must be sustained."

. . . .

"Issues Actually Involved—This Court, as we analyze its decision, concluded that the appellant was seeking a rate which would yield a fair return upon its investment —this rate, of course, would include operating expenses and a fair return on the value of the property of appellant used and useful in Idaho. That major premise of the court is incorrect—we understand, now that we have given further consideration to the opinion and briefs, just how the court was led into its erroneous viewpoint, and we will touch upon it later, but it is a fact that neither the appellant nor the Commission ever had any idea, as this Court finds, that the appellant was seeking a rate which would make a *return* on its property." (Italics mine.)

In its application filed with the Commission March 22, 1938, petitioner alleged:

"That the exchange rates, charges, and rentals set forth in Exhibit 'F' (the proposed new schedule of rates) and which said rates, charges, and rentals this applicant seeks an order from this Commission authorizing this applicant to place in effect on the first billing dates subsequent to April 22, 1938, when placed in effect will, in the belief of the applicant, enable the applicant to meet its operating expenses and taxes in the State of Idaho and in addition obtain a *return* upon the cost of its property in the State of Idaho devoted to the public service but that such return will be less than one per cent either during the year 1938 or so far as can now be estimated or determined during the year 1939." (Italics mine.)

It will be observed appellant alleged in its application the "rates, charges, and rentals this applicant seeks an order from this Commission authorizing this applicant to place in effect . . . will . . . enable the applicant to meet its operating expenses and taxes in the State of Idaho *and in addition obtain a return* upon the cost of its property in the State of Idaho devoted to the public service." From which it is clear appellant sought rates which not only

would enable it to meet its operating expenses and taxes but which also and "in addition" would give it a *return* upon its investment in the State of Idaho—the *return* being estimated (whether correctly is not important so far as the point under discussion is concerned) at less than one per cent for the years 1938 and 1939. It thus appears the application completely refutes appellant's contention "that neither the appellant nor the Commission ever had any idea, as this Court finds, that the appellant was seeking a rate which would make a *return* on its property." (Italics mine.)

Furthermore, appellant originally complained, as pointed out in the foregoing opinion:

"The Commission erred particularly as follows in denying through its order No. 1718, the application of the appellant to put into effect its schedule of increased rates:

(A) In its finding No. III, in the statement that the hearing was in no wise a valuation hearing and that the valuation of appellant's property was not necessary, proper, or material to a fair and complete determination of the application, which statement is sharply at variance with and contradictory of the first portion of said Finding No. III wherein the Commission *found correctly* that the hearing was one for an increase of rates sufficient to enable appellant to meet its operating expenses and taxes and, in addition thereto, *obtain a return upon the fair value* of its property in Idaho devoted to the public service and of necessity in this broad statement requires fixation of the fair value of appellant's property used and useful in Idaho." (Italics mine.)

The portion of Finding No. III, above referred to as being correct, is:

"That the hearing pursuant to the scope of the application, was one for an increase in rates, sufficient to enable applicant to meet its operating expense and taxes, and in addition thereto obtain a return upon the cost of its property in Idaho devoted to the public service; . . . "

Moreover, appellant further earnestly urged the Commission erred in that it "*did not* make any finding of a *fair rate of return* to which appellant is entitled for its services as a telephone company in the State of Idaho."

(Italics mine.) It was not insisted then, as it is now, that appellant was prevented from showing what a fair return would be. Then, appellant was contending the Commission erred in not finding a fair rate of return, which contention, of course, would have had no merit whatever if, as appellant now urges, the Commission rejected its evidence. In other words, the only basis upon which that contention could have been made would necessarily be that appellant had proved a fair rate of return but that the Commission, nevertheless, failed to make a finding demanded by such proof.

However, after this court affirmed the order of the Commission (upon the ground appellant had failed to prove what a fair rate of return would be), comes the contention in the brief on petition for rehearing that:

"there is the more impelling fact *that regardless of evidence, the Commission refused to consider fair return and fair value, claiming that the hearing was limited to proving operating expenses were less than revenues, and that fair value and fair return had no place in the hearing.*"

As above stated, originally appellant contended the Commission "found correctly the hearing was one for an increase of rates sufficient to enable appellant to meet its operating expenses and taxes and, in addition thereto, obtain a return upon the fair value of its property in Idaho devoted to the public service"; but now it is vigorously contended "the hearing was limited to proving operating expenses were less than revenues, and that fair value and fair return had no place in the hearing."

Furthermore, in its brief in support of its petition for a rehearing appellant for the first time contends:

"When appellant tried to comply with the Idaho rule by supplying the reproduction cost, the Commission's attorney objected. . . . The Commission *sustained this objection,* so if it were error on appellant's part, as this Court has stated, to fail to show the Commission what a fair return would be, *that failure was not due to the appellant for it had the evidence and tried to present it to the Commission and that body flatly refused to allow it to be introduced.* Surely, the error, if any, was the result of the Commis-

sion's failure to listen to necessary evidence of value—
*not the failure of appellant to prove that value.* No plain-
tiff could ever successfully bear the burden of proving his
case if the court just point blankly refused to admit the
necessary and competent evidence."

It is true the Commission, on motion of its attorney,
struck from the record the testimony of the Company's
witness, I. F. Dix, relating to cost of reproduction, cost of
replacement and fair valuation of appellant's Idaho prop-
erty. However, a careful examination of appellant's briefs
filed in this court on the original hearing discloses that
this ruling of the Commission was not assigned as error.
And it may be added that an examination of the transcript
discloses that every exhibit offered by appellant in sup-
port of its application, with the single exception of Ex-
hibit No. 16 (which was neither rejected nor admitted),
was received in evidence; and this includes petitioner's
exhibits in regard to cost of reproduction (Ex. No. 26)
and cost of replacement (Ex. No. 24).

For the above stated reasons the petition should be
denied.

Budge, C. J., Morgan and Ailshie, JJ., concur in denying
a rehearing.

GIVENS, J. (Dissenting on petition for rehearing)—
Adherence of the majority to the original opinion, ren-
ders a rehearing futile, hence I did not ask for a rehear-
ing, but submit my views as follows:

Appellant sought in the alternative a rate which would
cover expenses and provide some return, not in excess of
what would be fair, on its investment in Idaho, or a rate
which would at least cover expenses of operation.

There was evidently confusion or disagreement be-
tween appellant, and respondent and its attorney, as to
whether this was a valuation hearing or merely a rate
hearing, and as to expenses divided into cost of service
and depreciation charges.

While it is true the request of the attorney for the
commission for valuation data was granted, the commis-
sion ultimately found as a fact that it was not a valuation

hearing and that appellant had not sustained the burden of proof resting upon it, not however because it had failed or refused to supply information as to valuation, but had so failed as to depreciation charges:

"Commission's Findings"
"III

"That the hearing pursuant to the scope of the application, was one for an increase in rates, *sufficient to enable applicant to meet its operating expenses and taxes, and in addition thereto obtain a return upon the cost of its property in Idaho devoted to the public service;* and in no wise a valuation hearing; the valuation of said property not being necessary, proper nor material to a fair and complete determination of the application. [Emphasis mine.]

* * * * * *
"V

"That the company did not furnish all of the information requested by the commission, in particular the depreciation charges incident to the fixed capital since construction and the amount of money that would have been in the depreciation reserve fund if such fund had been kept showing the amount that would have been deposited in said fund and the disposition made of such money; that the company did not furnish a segregation of the depreciation reserve to show the amount of said reserve applicable to the property used and useful in the State of Idaho."

And then proceeds to find the question of depreciation outside the issues:

"VII

"That the Commission fails to find or fix any rate of depreciation on the properties of the applicant in Idaho, for the reason that the finding of such rate and fixation thereof is outside the scope of this hearing."

The commission's determination of the case adversely to appellant rests on finding VIII, IX and X, that its losses were due to excessive expenses:

"VIII

"That the Commission fails to find and determine the

expenses claimed, charged and incurred and disbursements made, for the reason that the evidence so offered is unsatisfactory, inadequate, and insufficient, leaving only the field of conjecture open to the Commission as a basis for any such finding.

"IX

"That the burden of proof is on the Pacific Telephone and Telegraph Company to justify the increases applied for; that in all the evidence, testimony and exhibits presented by the Pacific Telephone and Telegraph Company in this case the only justification attempted lies in its claimed annual losses from operation.

"X

"That the operating territory of the Pacific Telephone and Telegraph Company in Idaho is equally as favorable to an operating profit as other operating territories in Idaho wherein other utilities furnishing the same service are in operation."

It would seem then the opinion affirms on the point that appellant failed to furnish valuation information ("as would give the company a fair return on its Idaho investment") which the commission by its findings held had nothing to do with the case and was not affirmatively or negatively the basis of its decision.

As I understand the commission's decision, it rests on two points: First, that appellant's depreciation set-up was incorrect, and second, that on a comparative basis of advantageous adjacent territory and relative costs of service, and contemplating its entire system, appellant's expenses in Idaho were excessive and responsible for its losses, that is, excess of expense over revenue. The commission either abandoned or disregarded any question of valuation. Vide its attorneys' brief page 65:

"The rule that the first essential in fixing rates is to determine the valuation of the property and then to determine whether the rate is reasonable, is applicable where a reasonable return upon the investment is sought by the utility but does not apply where the utility is seeking a rate that will pay operating expenses and thus where, at most, the records of the appellant show a failure of the rate in force to pay operating expenses of the com-

pany, it would be unreasonable to require or *accept evidence* of the value of the company's property, before the Commission could act. The matter of valuation is serious and costly; in the absence of an independent valuation by the Public Utility Commission simultaneously with that by the company, the company would be placed in an advantageous position at the hearing, because the whole subject matter would be peculiarly within its knowledge, and any cross-examination of its experts would be unavailing.

"A valuation is unnecessary in determining the reasonableness of an application for an increase in rates, when the company cannot under any reasonable circumstances expect to earn a fair return on the value of the operative property, no matter by what standard this valuation might be measured." (Emphasis mine.)

In other words, the commission held no increase was justified to even cover what appellant contends were its legitimate expenses and depreciation charges, hence no rate on any valuation would ensue, consequently valuation was out of the picture. No legitimate affirmance can thus rest on failure to furnish evidence of valuation.

It is contended no assignment of error challenged the commission's refusal to admit the proffered testimony of Dix (appellant's witness) as to valuation; the record thereof being self explanatory:

Direct examination by Mr. Rupp:

"Q. Please state your name?

A. I. F. Dix, Seattle, Washington.

Q. What is your position with the Pacific Company?

A. Vice-President and General Manager in Charge of the Washington-Idaho area.

Q. Have you prepared a statement of your experience in the telephone business?

A. I have.

(Statement Telephone experience—Petitioner's Exhibit No. 54, marked for identification.)

Q. The docket I hand you shows that experience?

A. It does, yes.

MR. RUPP: I offer in evidence Petitioner's Exhibit No. 54.

MR. THOMAS: No objection.

PRESIDENT CORNELL: Petitioner's Exhibit No. 54 will be admitted.

Q. Now in the various capacities in which you have been employed by the Pacific Company, have you had anything to do with making appraisals of property?

A. I have.

Q. And for what purpose were those appraisals made?

A. Made as a basis for rate making, purchases and for sales.

Q. How much in dollars, telephone property, have you appraised?

A. In excess of $140,000,000.00.

Q. Will you tell the Commission what your functions and duties as general manager of the Washington-Idaho area are?

A. Well, I have managerial responsibilities for this area.

Q. To what extent are you familiar with the properties of the company in Idaho?

A. I am familiar with them.

Q. With the exception of Mr. Flaeger, who has testified, what is the fact as to whether or not all the other witnesses who have testified at this hearing report to you?

A. They all do.

Q. What measure of control do you exercise over them?

A. Well they are all under my supervision.

Q. Do you know anything about the amount of property that the company has in the State of Idaho?

A. I do.

Q. Do you know anything about what it would cost to— cost of replacement of that property would be?

A. Yes.

MR. THOMAS: I object to that as immaterial to this inquiry, replacement value of that property, and for the same reasons heretofore objected to.

PRESIDENT CORNELL: The objection will be sustained.

MR. RUPP: May I suggest to the Commission that the cost of replacement of this property was the thing required by the Commission, and so far as I can recall the

preceding objections did not run to the cost of replacement at all—it ran to the cost of reproduction—replacement cost was something required by the Commission.

MR. THOMAS: The question was with reference to the original cost of production, that was the thought I had in mind.

MR. RUPP: What I propose to do by this witness is to ask him what a fair value of the company's property in the State of Idaho is.

MR. THOMAS: That same question was asked yesterday.

MR. RUPP: Yes, but Mr. Flaeger stated that he had never been in Lewiston before this hearing. This witness has. This is an entirely different witness.

MR. THOMAS: Of course our objection yesterday was primarily upon the ground that that would be immaterial, and furthermore that there should be and is better evidence, and there is no occasion for the use of secondary evidence of that value. I think there is better evidence of it.

MR. RUPP: Perhaps I might say now that in the last analysis Mr. Thomas' objection rather ran to the effect that this is not a valuation hearing at all, having to do solely with rates. Now if there is such a thing as a rate hearing, under all the circumstances, without a valuation hearing, that might be one thing—but it is my understanding of the decisions of the United States Supreme Court that in the last analysis what has to be determined in connection with a new schedule of rates is the fair value of the company's property, and the fair value, in the last analysis, is the judgment of the value of the man who is familiar with the property, and who takes into consideration the original cost, if known, the cost of replacement, if the original cost is not known, and the cost of reproduction—all those factors which enter into what the United States Supreme Court has held is fair value, and what I am proposing to do by this witness, who is in charge of the operations of the company in the state of Idaho, and who, if permitted to answer these questions, in my judgment, will show that he knows the various factors of value, and this question is just one of a series of questions

designed to show what the witness does know about these various factors which enter into a determination of fair value.

PRESIDENT CORNELL: Now in this matter, the Commission will go back to the original cause, original motion, and in view of the understanding in that case, unless the Commission requested you to furnish the information at this hearing now, it will not be entertained. However, it was never intended to go into this valuation proposition, so therefore you should continue along those lines. Any evidence you have as required by the Commission at the former hearing certainly will be most welcome, with the understanding of the motion we had at the former hearing.

MR. THOMAS: (After argument) I haven't had time to investigate this, or to go into the cases, and for that reason, unless somebody suggests something better, I would be willing that the ruling be withdrawn and to reserve a ruling on the matter until we have made a final determination as to whether or not our position in this valuation matter is erroneous, and I might say that if it is, and that the matter of valuation is proper in this case, then certainly I shall be profoundly surprised, and I think my associates would be too, and if so, I think we would be entitled to some further consideration because we all know that if it gets to a question of valuation the same right rests, and should rest, with the Commission to make a determination of that matter. That is what I had in mind. Now if somebody here has something better to suggest, in order not to unduly delay this matter and duplicate expense, I would be pleased to hear from them.

PRESIDENT CORNELL: Do you have anything to say, Mr. Hawley, or Mr. Rupp?

MR. HAWLEY: I think it will be quite satisfactory to reserve a ruling, but I think possibly it would be well to permit the questions to be answered by the witness Dix, with the reservation that a ruling on the subject will be made later, and then, we have at least the record available. I do not know whether counsel has any different ideas.

MR. RUPP: I have always been of the opinion that one

man's word is no man's word, and that everybody should have the right, in a judicial inquiry, to make a full and complete showing of what his position is in the controversy. I haven't the slightest disposition, so far as I am concerned, if Mr. Thomas feels subsequently that something should be done on his part, that that be done. I don't want to shut anybody off.

PRESIDENT CORNELL: The request of Mr. Hawley, and the State's counsel, will be granted, and decision of the motion made is withdrawn, and the Commission reserves the right to pass on this matter at a later time.

PRESIDENT CORNELL: Just a minute—Mr. Durham, do you have something you wish to say now?

MR. DURHAM: Yes, we have an appearance at the original hearing for certain protestants. To those I would like to add the name of the Lewiston Chamber of Commerce, as a protestant, against the increase and I would like to have the name of Marcus Ware entered as an attorney for the protestants.

PRESIDENT CORNELL: That will be granted.

Q. (By Mr. Rupp) I think the question asked you was whether or not you knew what it would cost to replace the property in Idaho. What is the fact, do you, or do you not know?

A. Yes, the amount as of December 31, 1937, was $1,141,174.77.

Q. Do you know what the cost of the reproduction of the property would be as of December 31, 1937?

MR. THOMAS: Just a moment, I would like to have it understood that we are objecting to all this testimony, without repeating the objection each time.

MR. RUPP: We will agree that it runs to it all, without repetition.

PRESIDENT CORNELL: All right.

Q. Do you know what the physical condition of the property is?

A. I haven't answered your previous question yet. The estimated cost of reproduction is $1,260,299.75.

Q. Do you know what the condition of the property is?

A. Yes, I do.

Q. What is the fact as to whether or not the company

has satisfactory connections with other telephone companies?

A. We do have such connections.

Q. Well, what in your opinion is the fair value of the company's property, used and useful and devoted to the public service in the State of Idaho?

A. $1,000,000.00.

Q. As of what date?

A. December 31, 1937.

Q. What would be your judgment as to the fair value of the property December 31, 1938—do you know the amount of net additions made during last year?

A. Yes, in the neighborhood of $34,000.00.

Q. What in your judgment is the fair value of the property as of December 31, 1938?

A. I would say $1,134,000.00.

Q. Mr. Erb suggests this to me—in determining that fair value of the property, just what consideration have you given to the fact that we have a number of subscribers and plants in the State of Washington, which is connected with the Lewiston Exchange?

A. I have included that in stating the fair value.

Q. In other words, your determination of fair value is the amount on the books less the cost of replacement, and less the cost of reproduction, less depreciation?

A. Yes, it is.

MR. THOMAS: I will make a motion at this time that the testimony of Mr. Dix be stricken from the record, for the same reasons that was given to the opinion evidence upon the reproduction value, I think.

PRESIDENT CORNELL: The commission will take the objection under consideration, and reserve a ruling.

MR. RUPP: May I ask that the Reporter read the last objection.

(Objection read by Reporter.)

MR. THOMAS: For the further reason that no proper foundation has been laid, and that Mr. Dix has not and is not qualified to render such evidence.

PRESIDENT CORNELL: The same ruling will apply to this additional objection as to the objection to the original question.

MR. THOMAS: We have no questions.

PRESIDENT CORNELL: You may be excused."

Disregarding Judd's statements and the ruling on the Dix exhibit, does not dispose of the numerous other assignments of error charging the commission refused to allow the additional rates because less than expenses of the company and claimed erroneous consideration of depreciation.

If the return be sought for cost of service plus return on the investment it would seem clear that a valuation of such investment was a necessary prerequisite for proper determination. (*Rural Tel. Co. v. Interstate Tel. Co.*, 55 Ida. 514, 46 Pac. (2d) 723.)

The telephone company now urges it sought and seeks a rate at least to cover cost of service. My understanding of the opinion was it was written on the theory the cases had not distinguished between the necessity of a valuation for a rate covering only the cost of service and no return on the investment. If there is such a valid distinction and the utility seeks only a return which will cover the cost of service on an economical and efficient basis no valuation is necessary.

If the users cannot afford to pay a rate which will cover cost of economical and efficient service, what rate will be the meeting place between two such opposites; taking into consideration the bearing of a rate covering cost of service only on the Idaho property as compared with the entire system and the law applicable thereto? That is, may a rate on a feeder or branch line be less than the cost of service on that line, yet if such rate is all the users on such branch or division can afford to pay, nevertheless such rate be sufficient, as not depriving the company of its property without due process of law, if any such less-than-cost-of-service return on such branch contributes to the income and business of the entire system whereby a profit, that is, cost of service plus fair return on the entire system, results?

If so and the rate found by the commission be such rate, then the order should be affirmed on that ground rather than because an unnecessary valuation, expensive in the long run to all, was not made. Especially since respondent

in its brief page 16 disclaims the necessity of any valuation.

Appellant does not rely alone on the question of valuation but raises other errors on the points determined by the commission. Though appellant may have been vacillating as to whether valuation was or was not a prerequisite, the commission ruled it out and the case here should be determined on the theory on which the commission decided it.

I therefore dissent from the opinion as written.